# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Smith*, 2012 IL App (1st) 102354

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SENECA SMITH, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-2354 |
| Filed<br>Rehearing denied | September 28, 2012<br>October 25, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for two counts of attempted first degree murder of a peace officer and two counts of aggravated discharge of a firearm were upheld where officers' testimony was credible, the State did not misstate or distort the evidence in closing argument, defendant was not denied effective assistance of counsel, he was not coerced into waiving his right to testify, the jury was properly instructed about other offenses and on the *Zehr* principles, and the 20-year sentence enhancement for personally firing a handgun was properly imposed. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-18171; the Hon. Joseph G. Kazmierski, Jr., Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and Jean Park, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justice Palmer concurred in the judgment and opinion.
Justice Gordon dissented, with opinion.

**OPINION**

¶ 1    After a jury trial, defendant Seneca Smith was found guilty of two counts of attempted first degree murder of a peace officer and two counts of aggravated discharge of a firearm. He was sentenced to a total of 55 years in prison.

¶ 2    On appeal, he contends that: (1) the State failed to prove his guilt beyond a reasonable doubt because the police officers' testimony was not credible and was contradicted by the physical evidence; (2) during closing argument, the State misstated and distorted the evidence and made improper suggestions; (3) defendant was denied effective assistance of trial and posttrial counsel; (4) defense counsel improperly coerced defendant to waive his right to testify; (5) the trial court erroneously instructed the jury about other offenses over defendant's objection; (6) the trial court failed to properly instruct the venire on fundamental principles of law; (7) the 20-year sentence enhancement imposed on defendant was improper under the statute; and (8) the number of defendant's presentence custody days should be corrected on his mittimus.

¶ 3    For the reasons that follow, we affirm defendant's conviction and sentence and order the correction of the mittimus.

¶ 4                                    I. BACKGROUND

¶ 5    The State arrested and charged defendant Seneca Smith with attempted first degree murder of Chicago police officers Calvin Chatman and Dwayne Collier, aggravated discharge of a firearm, aggravated unlawful use of a weapon, and unlawful use of a weapon by a felon, alleging that, on June 27, 2004, defendant shot at the officers with a handgun.

¶ 6    At the trial in October 2007, the State presented the testimony of Officers Chatman and Collier. According to the officers' testimony, on June 27, 2004, they were assigned to go to the 5300 block of West Congress Parkway and conduct surveillance on a red Chevy Caprice,

which was believed to contain guns and drugs that were associated with a shooting that had occurred on that block earlier that day. Officers Chatman and Collier went to that location in a covert van. Officer Chatman was in the driver's seat, and Officer Collier was in the front passenger seat. They were in civilian dress and wore their police badges on chains around their necks. Officer Chatman was armed with a Sig Sauer 9-millimeter semiautomatic handgun with Luger hollow-point ammunition. Officer Collier was armed with a Smith and Wesson 9-millimeter semiautomatic weapon.

¶ 7     At about 10:30 p.m., the officers arrived on the block and parked their van facing westbound in front of 5310 West Congress Parkway, on the north side of the street. They were approximately five houses west of the intersection of Congress Parkway and Lockwood Avenue. The 5300 block of Congress Parkway is a one-way street for westbound traffic. Meanwhile, east of Officers Chatman and Collier's van, uniformed Chicago police officers Lacey Harris and Hymie Robertson were near the intersection of Congress Parkway and Lockwood Avenue. Officers Harris and Robertson's marked squad car was parked and facing southbound. They were at that location on a different assignment; they had responded to the shooting at 7:30 p.m. that day on the 5300 block of West Congress Parkway and were waiting for a tow truck to remove a vehicle allegedly involved in that shooting.

¶ 8     The red car under surveillance by Officers Chatman and Collier was parked on the south side of West Congress Parkway, approximately four or five houses west of the officers' van. The street lights were on, and other people were on the street, including a man watering his lawn, another man retrieving items from the trunk of his car, and a couple on the porch at 5310 West Congress Parkway. There was a group of 6 to 10 black males on the north side of the street about seven or eight houses to the west of the officers. One teen broke away from that group, approached the officers' van, and stopped directly in front of 5310 West Congress Parkway. He folded his arms and stared at the van. He stood parallel to the van's passenger-side door for 10 to 20 seconds and then walked back to the crowd and started to talk demonstratively and wave his hands. Then, he backed away from that crowd and pointed directly at the officers' van.

¶ 9     Within seconds, defendant came out of that crowd and walked east on the sidewalk, on the north side of the street, toward the van. Officer Chatman could not see both of defendant's hands as he walked toward the van. Defendant's right hand was underneath his jersey, so Officer Chatman unholstered his gun and held it in his right hand. He warned Officer Collier, who was using his cellphone, holding it about 10 inches in front of his chest while speaking into the speaker phone. Officer Chatman also pulled his badge out from beneath his jersey and draped it on his chest.

¶ 10     When defendant was approximately one house away from the van, his walk became a slight jog toward the van's passenger-side door. His hand was still underneath his jersey and he said,"What the fuck you niggers want, what you niggers on," and "What you doing here." Officer Chatman responded, "Relax, we're the police." Defendant constantly turned his head to look eastward to the intersection of Congress Parkway and Lockwood Avenue and then back to Officers Chatman and Collier. Defendant looked eastward one more time, said, "Fuck that," and raised a black-colored handgun in his right hand to the right side of Officer Collier's face. Officer Chatman extended his right hand, placed his knuckles into Officer

Collier's chest area, and fired his gun twice in the direction of defendant.

¶ 11    Defendant went to the ground, and the officers exited the van. Defendant got up and ran westbound on the north side of the street. Officer Collier yelled, "Police, stop," and chased him. Meanwhile, Officer Chatman ran parallel to them in the middle of Congress Parkway. Officer Collier continued to announce his office, and defendant ran in a southwesterly manner onto the street. Defendant turned and pointed his gun in his right hand in the direction of Officers Collier and Chatman and fired. Officer Collier testified that defendant fired once or twice, and Officer Chatman testified that he heard two gunshots. Although defendant was facing south, his upper body was twisted so that his arm was facing east. Officers Chatman and Collier veered back to the north side of the street but kept running westbound, and Officer Collier fired two gunshots at defendant.

¶ 12    Defendant ran to a building at 5331 West Congress Parkway and tried to force the door open with his right shoulder. Officer Collier took cover behind a large tree on the south side of the street at that address. Officer Chatman also took cover nearby behind a vehicle on the south side of the street. Officers Chatman and Collier testified that there was not a group of girls or civilians in the doorway of 5331 West Congress Parkway. Then, defendant pointed the gun in his right hand in the direction of Officer Collier, who fired two more gunshots. At that time, the door opened and defendant fell or went inside the dark vestibule. Officers Chatman and Collier never saw defendant throw or drop the gun during the entire incident.

¶ 13    Officer Collier cautiously approached the door with his gun drawn and went into the vestibule. He looked through an open doorway to a basement apartment and saw defendant lying at the bottom of the steps. At that point, Officer Collier heard women in the basement yelling and screaming. Officer Chatman testified that he heard people screaming after defendant entered the basement door, but he was not certain about the address from which the screams had emanated. Officer Collier went back outside and ran eastbound down the block to get assistance. He was met by Officer Robertson, and they returned to 5331 West Congress Parkway and stood in the street as more police cars started to arrive at the scene. Meanwhile, Officer Chatman returned to the van and drove around the corner to cover the back of 5331 West Congress Parkway to prevent anyone from leaving. Other officers, however, had arrived at the scene, so Officer Chatman directed them down the alley and then returned to the front of the building. When Officers Chatman and Collier met at the front of the building, they embraced, inquired into each other's well-being, and cried. The officers learned later that a bystander in the building, Chantel Davidson, had been hit by a bullet during this incident.

¶ 14    Fifty-six-year-old Jerry Blakes testified that he lived on the 5300 block of West Congress Parkway. At the time in question, he was cleaning glass out of his car, which had been damaged by the shooting earlier that day. He heard some noise and saw a policeman walk past with a badge around his neck. A few seconds later, the officer hollered, "police, police." Blakes did not see anyone else running on the street that evening and did not hear any gunfire.

¶ 15    Chicago police officer Paul Presnell was a forensic investigator. He and his partner arrived at the scene about 11:55 p.m. and processed the scene. They did not administer a

gunshot residue test to defendant because he had already been taken to the hospital for medical treatment. At 5331 West Congress Parkway, there were two bullet holes in the glass of the front door. Blood and a metal fragment were on the vestibule floor, and blood was on the basement floor. Outside, they searched for evidence, starting on the eastern part of the block and moving west. They found 15 pieces of firearms evidence, placed numerical markers by the evidence and photographed the evidence. That evidence included 10 fired cartridge cases, 2 fired bullets, and 3 metal fragments. Concerning the fired cartridge cases, they recovered four Speer 9-millimeter Luger cartridge cases, two CBC 9-millimeter Luger cartridge cases, and four R&P 45 auto cartridge cases. For each piece of firearms evidence, Presnell testified concerning where it was recovered by reference to the nearby residential address and whether it was found on the street, grass or sidewalk.

¶ 16    After the investigators left the scene, they were called back about 45 minutes later to recover a Ruger 9-millimeter semiautomatic pistol from under a bush in front of the residence at 5318 West Congress Parkway. The scene was no longer taped off or secured. The gun had 1 live round in the chamber and 11 live rounds in the magazine. They also recovered from 5316 West Congress Parkway a fired S&B 9-millimeter Luger cartridge case. At 5324 West Congress Parkway, they recovered a fired R&P auto cartridge case. At 5328 West Congress Parkway, they recovered a fired Speer 9-millimeter Luger cartridge case. From a van located at 620 South Lockwood Avenue, they recovered one fired cartridge case and broken glass. They looked for, but did not find, blood on other parts of the street.

¶ 17    Tonia Brubaker, of the Illinois State Police forensic science command, testified as a firearms expert. She explained the process of firearms identification and had compared the cartridge cases and bullet fragments recovered in this case with the Ruger handgun that was found under the bush, Officer Collier's Smith and Wesson handgun, and Officer Chatman's Sig Sauer semiautomatic handgun. The Ruger was loaded with 11 unfired 9-millimeter Luger caliber cartridges and 1 in the chamber. She concluded that two 9-millimeter Luger cartridge cases, a bullet jacket fragment, and two other fragments were fired from the Ruger firearm. Moreover, four Speer 9-millimeter Luger cartridge cases and one bullet fragment were fired from Officer Collier's Smith and Wesson handgun. In addition, two Speer 9-millimeter Luger caliber fired cases were fired from Officer Chatman's Sig Sauer firearm.

¶ 18    Brubaker had received other cartridge cases, bullets and fragments in this case that did not match any of the three guns in this case. However, the Ruger also matched evidence from the shooting earlier that day on the same block. There were a total of 6 cartridges that were fired from the Ruger, which holds up to 17 bullets, and Brubaker had received a total of 12 unfired cartridges with the Ruger, which meant that the Ruger had been reloaded.

¶ 19    Davere Jackson was formerly employed by the Illinois State Police. She testified about her education, qualifications and experience, and the trial court, without any objection from the defense, found her qualified to testify as a DNA analysis expert. She briefly explained DNA and forensic DNA analysis to the jury and stated that the testing methods used in this case were generally accepted in the scientific community. She testified from her report that she had generated a DNA profile from defendant's sealed buccal standard and compared it with two sets of swabs that were collected from the Ruger firearm. Concerning the first set of swabs, which were collected from the left-side handle, trigger guard, magazine release and

-5-

hammer spur of the Ruger, Jackson identified a mixture of human DNA profiles, which she interpreted as having been contributed by at least two people. It was a low level mixture, which meant that there was not enough DNA to make a full match with the standard. Due to the low level of DNA, the sample could not be used to differentiate between one person and another; it could only be used to exclude someone. Jackson stated that because there was an inconclusive result, no conclusion could be drawn as to whether or not defendant could have contributed to the mixed profile from the first set of swabs.

¶ 20      Concerning the second set of swabs, which were collected from the right-side handle, safety lever, trigger guard and butt of the Ruger, Jackson identified a mixture of human DNA profiles, which she interpreted as having been contributed by two people. She compared that mixture to defendant's DNA profile and concluded that he could not be excluded from having contributed to the mixture. It was a partial profile. Jackson looked at 10 areas on the DNA and was able to generate 6 of the 10 areas from the second set of swabs but 4 were missing. In addition to looking at areas, she also looked at the amounts, which was how she was able to do her interpretation. She was able to conduct a calculation to estimate how common or rare the mixture of DNA profiles was in the general population and concluded that approximately 1 in 11 black unrelated individuals could not be excluded from having contributed to that mixture; 1 in 21 white unrelated individuals could not be excluded from having contributed to that mixture; and 1 in 11 Hispanic unrelated individuals could not be excluded from having contributed to that mixture. Thus, of blacks, 9% of the population were included as contributors and 91% were excluded. Defendant was not excluded.

¶ 21      Jackson explained why frequencies among the populations can appear to be low. Fourteen areas on the DNA are looked at to determine statistics through frequencies, but this case involved a very low level of DNA and a mixed sample. Consequently, Jackson had to use everything she saw in the mixture, and she only saw things at six areas of the DNA. A calculation of frequencies of only six areas with several different DNA alleles lowers the statistical value of the calculation. Although Jackson did not have an expert opinion as to whether or not defendant could have handled the Ruger, Jackson testified that based on the results of her testing, it was possible that defendant could have handled the Ruger. She testified that factors which affect the transfer of DNA from skin to an object include whether the skin was broken, if there was a cut, how long the skin was in contact with the surface, if there was rough handling, and whether the subject's hands were clean.

¶ 22      Assistant State's Attorney (ASA) Catherine Gregorovic testified that on the evening of June 28, 2004, Katrina Robinson agreed to give a handwritten statement. According to the statement, Robinson was going to the store on June 27, 2004 at about 3 p.m., but she stopped at Van Buren Street and Central Avenue to listen to what her friend and defendant were saying. Defendant lifted up his shirt and showed Robinson's friend a gun. Furthermore, during the shooting at issue on appeal, Robinson was already in the vestibule when defendant pushed his way into the hallway, and Robinson could not see what was happening because she was pushed against a wall. Robinson gave her statement voluntarily, she had no complaints about her treatment, and her mother was present the entire time.

¶ 23      ASA Karin Swanson testified that she presented Robinson to the grand jury on July 7, 2004, and Robinson's testimony was completely consistent with the handwritten statement

she had given to ASA Gregorovic.

¶ 24    Katrina Robinson testified that she was 15 years old in 2004 and knew defendant from her neighborhood. She did not remember seeing him lift his shirt or whether he was alone or with somebody else. Initially, she said she did not remember speaking to an ASA on June 28, 2004, but later admitted that she read over her statement and signed it. She said she did not remember telling the ASA the things that were in her statement, but even if she had said those things, she "was trying to get them up out of [her] face." When she was asked if she had said in her handwritten statement that no threats or promises were made to her, she said, "I probably did, but that don't mean it was true." When she was asked specific questions about her grand jury testimony, she responded either, "I don't remember," "I guess," or "Lie."

¶ 25    On cross-examination, Robinson said she was outside of 5331 West Congress Parkway when the police were out there and defendant was shot. After the shooting, she gave a statement at the police station but she was very tired. She asserted that, contrary to her written statement, she did see what was happening in the hallway at 5331 West Congress Parkway and defendant did not have a gun when the police were shooting at him.

¶ 26    The parties stipulated that Chantel Davidson was treated at the hospital on June 27, 2004 for a gunshot wound, and a bullet was removed from her upper back. The parties also stipulated that defendant was treated "for multiple gunshot wounds to the chest, a gunshot wound to the arm, and a gunshot wound to the leg." Furthermore, a "lodged bullet was removed from [his] left upper back." Photographs of Davidson and defendant as they appeared at the hospital were submitted into evidence.

¶ 27    For the defense, 19-year-old Shanice Wooden testified that her family lived at 5314 West Congress Parkway at the time of the shooting. On that day at about 7 p.m., she was sitting with three people in a car across the street from her house. They were listening to music, and the car windows were down. Shanice's brother Sean was sitting on their grandmother's van. Shanice's sisters were on the porch, and her mother, Dora Wooden, was on the upstairs balcony. Then, Teddy and two other males came around the corner of Congress Parkway and Lockwood Avenue. One of the males called Sean over to them, but Dora Wooden told him to run because the men had guns. Teddy had two guns, and the two males both had a single gun. Sean, who did not have a gun, ran, and the three males chased him and fired their weapons. Sean was shot in the back by Teddy on the north side of the street a few houses away from 5314 West Congress Parkway and fell paralyzed onto the grass.

¶ 28    Shanice testified that Teddy dropped one of his guns, and he and the other two shooters ran into a crowd of people and blended in. Shanice picked up Teddy's gun and chased the three men. When she got to the end of the block, a police officer ordered her to stop. She dropped the gun, and the police recovered it. She never fired the gun. Shanice was arrested and questioned by the police at the station. She was released the next morning and never charged. She never saw defendant on the street at the time Sean was shot. She had spoken to defendant a couple of times, and Sean and her mother, whom defendant called Cookie, had also spoken to defendant. Sean, who was deceased, was not in a street gang.

¶ 29    Dora Wooden, Shanice's mother, testified consistently with Shanice about the shooting

of Sean. Around 10:30 p.m., Dora Wooden, her husband, and her daughter returned home from the hospital and police station. They had parked their car around the corner and were talking as they walked on the north side of the street, near 5310 West Congress Parkway. Defendant was standing near Dora Wooden's house and said, "Ma." Dora Wooden looked up and saw that defendant had a green, plastic soda bottle in his hand. He did not have a gun. People were sitting in a van parked in front of Dora Wooden's house and drinking from Styrofoam cups. A person in the van yelled something like, "motherfucker, you," and the person on the passenger side of the van pointed a gun out of the van and fired. Defendant was shot in the chest, rolled over backwards and then ran west. The people exited the van, and Dora Wooden noticed the police badges dangling from their necks. Dora Wooden ran onto her porch and lost sight of defendant. There was blood on the sidewalk near the soda bottle defendant had dropped. Dora Wooden told the police officers who were securing the area about the soda bottle, and one officer picked it up.

¶ 30    Dora Wooden testified that her son Sean was not in a street gang but he would "adapt to his environment" and had called himself a Four Corner Hustler when he was a child. Defendant and Sean were friends, and Sean had filed complaints against the police in the past. Dora Wooden advised the Warfields to sue the police. She denied telling the police after the shooting that defendant had the bottle in his left hand and she could not see his right hand or the right side of his body.

¶ 31    Carrie Warfield testified that she was 24 years old and lived in the basement apartment at 5331 West Congress Parkway. She received income from Social Security and from doing hair in her home. At 10:30 p.m. on the date in question, she was coming home from the store with Chantel Davidson, Katrina Robinson and five other females. Warfield knew defendant, who was across the street, and greeted him as he walked east on Congress Parkway with a soda bottle in his hand. When Warfield heard gunfire, she ran into her vestibule with the other females. The vestibule door did not have a lock, and defendant ran up behind them and came in the door. Warfield heard more gunfire, screamed and beat on her apartment door and her landlord's door. The gunshots were getting closer, and the females were screaming and hollering. Defendant grabbed four women, none of whom was Chantel Davidson, and "grabbed them like to the back of him and he put his hands around them." He did not have a gun. Gunshots came through the glass of the door. Defendant was hit by bullets and was lying on the floor. Warfield's sister inside the basement apartment unlocked the door, and the females stepped on defendant as they ran down the basement steps. Defendant could not move, so Warfield put her hands under his arms and they "flipped" down the stairs. The basement door slammed shut and automatically locked. Defendant landed on his back, and Warfield saw that he had no gun.

¶ 32    Warfield telephoned the police, who arrived immediately. When Warfield opened the door for the police, they put their guns in everyone's face, grabbed defendant, and handcuffed him. Warfield consented to the officers' request to search the apartment. The police made the females sit on the couch during the search. Then, the officers moved some items that blocked the back door of the apartment and made the girls go out the back door. Warfield never saw anyone in her group take a gun anywhere. Warfield and other members of her family were suing the police department concerning this shooting incident.

¶ 33    When Warfield was asked specific questions about her deposition testimony in her civil case, she denied stating that defendant pushed open the door to get inside the vestibule. Warfield also denied telling the police that she did not know defendant at all. In addition, Warfield had testified at her deposition that she was suing because Dora Wooden had said that she saw people sitting in the van and told defendant to find out who they were, but before defendant got to the van, two males jumped out of the van, fired their guns at defendant and chased him.

¶ 34    In rebuttal, the State presented the stipulated testimony of Detective Schalk, who would testify that he interviewed Dora Wooden after the shooting of defendant and she said that defendant had a plastic bottle in his left hand and she could not see his right hand. The parties also stipulated that Carrie Warfield stated in her deposition that she did not know where defendant was when she got through her front door and entered her vestibule. She also said that the vestibule door was closed when she was trying to put her key in her apartment door and defendant pushed the vestibule door open to get in. Furthermore, she said that she told the police she did not know defendant because she did not feel safe and the police were harassing her about a gun.

¶ 35    The jury found defendant guilty of two counts of attempted first degree murder of a police officer and two counts of aggravated discharge of a firearm. The trial court merged the aggravated discharge of a firearm counts into the attempted murder counts, and sentenced defendant to 35 years for each count, to run concurrently. The trial court added 20 years for the discharge of a firearm for a total of 55 years in prison. Defendant appealed.

¶ 36                                              II. ANALYSIS
¶ 37                                    A. Sufficiency of the Evidence
¶ 38    Defendant argues the State failed to prove his guilt beyond a reasonable doubt because the testimony of Officers Chatman and Collier was unconvincing, improbable, and contradicted by the physical evidence. Specifically, defendant asserts it was unbelievable that Officer Collier remained on his cell phone if defendant approached the van in a confrontational manner, and that defendant would have pointed a gun at Officer Collier's head when uniformed police officers were in a squad car near the end of the block. Further, defendant asserts it was unbelievable that the officers did not see or hear the group of females in the vestibule and did not attempt to seize defendant or check whether the females were hurt. Moreover, the Ruger gun defendant allegedly used was not found on him or at the scene when he was taken into custody, and the partial DNA profile the State used to link defendant to the Ruger gun was questionable. In addition, the integrity of the firearms evidence was compromised because it was intermingled with evidence from the earlier shooting of Sean Wooden, and the location of the recovered bullet jacket fragments contradicted the officers' testimony about where defendant allegedly fired gunshots at them.

¶ 39    Criminal convictions are not to be overturned on review unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The test to be employed on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* The jury is charged with the responsibility of weighing the credibility of witnesses and resolving any conflicts and inconsistencies in their testimony, and the jury's determination of a defendant's guilt or innocence is entitled to great deference. *People v. Schott*, 145 Ill. 2d 188, 206 (1991); *People v. Parker*, 234 Ill. App. 3d 273, 274 (1992).

¶ 40    The same arguments defendant raises on appeal were made to the jury by trial counsel. The jury must resolve factual disputes and make credibility determinations, and the record establishes that the jury was fully aware of all of the impeachment issues in this case by defense counsel's cross-examination of the witnesses and arguments. The jury, however, necessarily rejected defendant's arguments because the jury found him guilty. After reviewing the evidence in the light most favorable to the State, we conclude that the evidence was not so unreasonable or unsatisfactory that it raised a reasonable doubt of defendant's guilt.

¶ 41    The testimony of Officers Chatman and Collier was credible and consistent. Moreover, their testimony was corroborated by other evidence. The fired casing found inside the van corroborated the officers' testimony that Officer Chatman, who was in the driver's seat, reached across Officer Collier's chest and fired the gun while inside the van when defendant was just outside the van alongside Officer Collier. That fired casing refuted Dora Wooden's contrary testimony that she saw someone's hand point a gun outside the van and fire at defendant, who was simply standing by the sidewalk. Furthermore, the recovered firearms evidence supported the officers' version of the exchange of gunfire as they chased defendant down the street. The fired cartridge cases found near 5316 and 5321 West Congress Parkway matched the Ruger gun found after the shooting. In addition, the testing of the low level DNA mixture found on the Ruger indicated that defendant was not excluded from the 9% of the black population that could have contributed to that DNA mixture.

¶ 42    Although the defense claimed that defendant was shot while he was standing in the vestibule and protecting the women behind him when the officers carelessly fired into the building, the firearms evidenced supported the officers' account that defendant was outside the vestibule and pointed his gun at Officer Collier, who fired two gunshots in response. Specifically, those two gunshots went through the glass door near the doorknob, and one bullet was found on the vestibule floor and the other bullet was removed from Chantel Davidson's upper back. Moreover, given defendant's height, the gunshot wounds to his chest and lower left leg were not consistent with the height of the two bullet holes in the glass door at the level of the doorknob.

¶ 43    The trier of fact is free to accept or reject as much or as little of a witness's testimony as it pleases (*People v. Logan*, 352 Ill. App. 3d 73, 81 (2004)), and Katrina Robinson's favorable trial testimony for defendant was severely impeached by her prior handwritten statement and grand jury testimony. Furthermore, a rational trier of fact could have concluded that the bullet fragments that were fired by the Ruger gun and were not consistent with the officers' accounts were on the street as a result of the shooting of Sean Wooden earlier that same evening. A rational trier of fact also could have concluded that it was possible to hide defendant's Ruger gun or smuggle it out of 5331 West Congress Parkway because the building was left unguarded by the police for a brief moment and it was possible

to move any items that may have blocked the back exit of the basement apartment.

¶ 44    Taking all the evidence in the light most favorable to the prosecution, we cannot say that no rational trier of fact could have found the testimony of Officers Chatman and Collier credible and consistent with the other incriminating evidence and concluded that defendant was proven guilty beyond a reasonable doubt of attempted first degree murder of two police officers.

¶ 45                                    B. Improper Closing Arguments

¶ 46    Defendant contends he was denied his right to a fair trial based on the prosecutor's erroneous and prejudicial comments during closing argument.

¶ 47    A prosecutor is allowed wide latitude during closing arguments. *People v. Nieves*, 193 Ill. 2d 513, 532-33 (2000). A prosecutor may comment on the evidence presented at trial, as well as any fair, reasonable inferences therefrom, even if such inferences reflect negatively on the defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Remarks made during closing arguments must be examined in the context of those made by both the defense and the prosecution, and must always be based upon the evidence presented or reasonable inferences drawn therefrom. *People v. Coleman*, 201 Ill. App. 3d 803, 807 (1990). The character and scope of closing arguments are left largely to the discretion of the trial court, and we will not disturb its decision absent an abuse of discretion. *People v. Aleman*, 313 Ill. App. 3d 51, 66-67 (2000). We will reverse a conviction on the ground of improper argument only if the challenged comments constituted a material factor in the conviction, without which the jury might have reached a different verdict. *Id.* at 67.

¶ 48    First, defendant asserts the State claimed, without any supporting evidence, that the recovered Ruger gun belonged to defendant and that somebody got rid of it. Contrary to defendant's argument, however, the record establishes a clear evidentiary basis for the prosecutor's comments. Specifically, the officers testified that defendant had a gun, fired it at them during the chase, and pointed it at them before he went inside the vestibule. Moreover, there was evidence that the Ruger found on the street the next day had been fired on the night of the shooting. There were several people in that basement apartment and it was full of "junk," so it was a reasonable inference that someone in that basement took control of that gun until it was found later the next morning under a bush on the street. See *People v. Shum*, 117 Ill. 2d 317, 347-48 (1987) (although there was no eyewitness testimony that the defendant had concealed the gun in question, it was a legitimate inference based upon the fact that a gun was used in the assault and not recovered).

¶ 49    Next, defendant asserts the prosecution stated, without any supporting evidence, that defendant's partial DNA was found on the Ruger gun. Defendant has forfeited review of this issue because counsel did not timely object during the prosecution's closing argument to the comments about defendant's partial DNA being found on the gun. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (in order to preserve an issue for review, the defendant must both timely object at trial and include the issue in his posttrial motion).

¶ 50    A court may, however, consider a forfeited issue as plain error. The plain error doctrine allows errors not previously challenged to be considered on appeal if either: (1) the evidence

is closely balanced and the jury's guilty verdict may have resulted from the error; or (2) the error was so fundamental and of such magnitude that the defendant was denied a fair trial and the error must be remedied to preserve the integrity of the judicial process. *People v. Hudson*, 228 Ill. 2d 181, 191 (2008); *People v. Herron*, 215 Ill. 2d 167, 177 (2005). "In plain error review, the burden of persuasion rests with the defendant." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The first step of plain error analysis is deciding whether any error has occurred. *Id.*; *People v. Durr*, 215 Ill. 2d 283, 299 (2005).

¶ 51    Although the dissent concludes that the prosecutor's remarks that defendant's partial DNA was found on the Ruger were "factually wrong and horribly misleading" (*infra* ¶ 123) the complained-of remarks must be reviewed in the context of the closing arguments made by both the defense and the prosecution. *Coleman*, 201 Ill. App. 3d at 807. In context, the complained-of statements about the DNA evidence were neither wrong nor misleading.

¶ 52    According to the record, the State initially stated that the Ruger was tested a month after it was recovered, nobody knew that it would be connected to the firearms evidence collected in the street in this case, and it supported the officers' accounts of the shooting. Concerning the DNA evidence, the prosecutor said:

> "The gun in this case did not have a full profile. We know that from the expert. It did have a partial profile that was compared to the defendant's DNA.
>
> What did the expert tell you? Well, when she compared it to the defendant's DNA, he could not be excluded as having touched that gun.
>
> It was a partial profile. 91 percent of the population could be excluded, but not him. Another coincidence? No.
>
> When you combine that with everything else you have in this case, it points to defendant's guilt."

¶ 53    Thereafter, the defense argued, *inter alia*, that if defendant was holding a gun instead of a soda bottle, then a gun would have been found with him in the basement apartment. According to the defense, the recovered Ruger was simply one of the two guns Teddy used when he fired at Sean Wooden on the street earlier that evening. The defense stressed that no witness testified that defendant had the recovered Ruger at the time of the shooting. Moreover, no physical evidence established that defendant had the recovered Ruger at the time of the shooting or that the Ruger was even fired during the shooting involving Officers Chatman and Collier. Furthermore, the firearms evidence recovered from the street could not be "differentiate[d]" between the 7:30 p.m. and 10:30 p.m. shootings. The police lied about not seeing the women outside the building defendant ran into, and there was no fingerprint evidence or gunshot residue evidence to show that defendant had the Ruger. Concerning the DNA evidence, the defense argued:

> "You can't just put aside the fact that it's a partial profile, which means it cannot be matched to any individual.
>
> What the technician said was people cannot be excluded, but she also said there are approximately 600 million other people who could not be excluded. That's a big group of people that you can't say couldn't have contributed to some of that DNA.

And you know what? It doesn't mean any of those 600 million people actually had to have touched that gun. It means when they are looking at the profile of the DNA, it's somewhat consistent with what they found."

¶ 54    The defense then made an analogy between the DNA evidence and the first three telephone numbers–869–for all the telephone numbers in the criminal court building. Without the other four numbers, a person would not be able to exclude any of the other telephone numbers in the building. Accordingly:

"You can't just say that because [defendant's] partial profile is like 600 million other people, that therefore he had this gun. So you have no physical evidence, and you have really no testimonial evidence to say that he was ever in possession of this particular weapon."

¶ 55    In response, the prosecutor argued that it does not make any sense to presume that the recovered Ruger was one of Teddy's guns, because it was used to shoot Sean, yet "[h]is buddy's[–*i.e.*, defendant's–]partial DNA is on the gun." Then, the prosecutor discussed how the "math doesn't work" for Teddy to have used the Ruger because it holds 17 rounds but 12 rounds were found in it, 4 casings were recovered on the street from the earlier shooting incident involving Sean, and Officer Collier testified that the Ruger was fired twice. The prosecutor argued that in order to account for that total of 18 rounds, someone would have had to put one more bullet into the Ruger before tossing it under the bush, but that does not make any sense because:

"If this is a gun being used to shoot at [Sean] Wooden, his buddy, why is his partial DNA on it?"

Then, concerning defense counsel's analogy about the DNA evidence and telephone numbers, the prosecutor argued that someone dialing 869 might not reach his telephone extension:

"But guess what? 869 gets you in the [building]. It doesn't put you down the block. It doesn't put you in the other county.

    That's why we presented that evidence to you. It's circumstantial evidence. We are not saying that in of itself makes it his gun.

    We are telling you it's circumstantial evidence. It's another piece in the puzzle that you will consider, and you will get instructed on that type of evidence by the Judge.

    But like my partner told you, when that gun's recovered, they don't know it's going to come back with a partial DNA on Seneca Smith. They don't know that its going to match firearm evidence that runs the trail that [Officers Collier and Chatman] told you he ran. That firearms doesn't get worked up for months.

    Somebody got that gun out of there. They either dumped it under the bush that night and it wasn't found in the dark, or it was recovered in the morning. That might account for why it's a partial DNA and no fingerprints. There's dew on the grass, other people's handwriting on it."

¶ 56    Our review of the record establishes that no error occurred here. When reviewed in context, the prosecutor's remarks were fair comments on the evidence, which showed that

-13-

a partial profile was generated from the DNA mixture collected from the Ruger and defendant could not be excluded from the 9% of the population that could have contributed to that DNA mixture. Specifically, the prosecution initially argued to the jury that the DNA expert recovered a partial DNA profile from the Ruger, compared it to defendant's DNA, and concluded that although 91% of the population could be excluded from touching the Ruger, defendant could not be excluded. Thereafter, the prosecution talked about defendant's partial DNA as a shorthand reference to the expert's testimony. The jury heard the prosecution's argument in that context and there is no indication that the jury, which heard the DNA expert testify, was misled by the prosecutor's arguments. Furthermore, the trial court instructed the jury that closing arguments are not evidence, and any argument made by the attorneys which is not based on the evidence should be disregarded. *People v. Gonzalez*, 388 Ill. App. 3d 566, 598 (2008).

¶ 57    Next, defendant asserts the State insinuated, without any supporting evidence, that defendant was a street gang member and this shooting was street-gang-related. Contrary to defendant's argument, however, our review of the record establishes that the State did not improperly insinuate that defendant was a member of a street gang simply because Sean was a street gang member and defendant was his friend. The prosecutor's statement that Sean was in a street gang was a fair comment on the evidence. Although Dora Wooden asserted that her son Sean was not a street gang member, she admitted that he would "adapt to his environment" and had called himself a Four Corner Hustler when he was younger. Moreover, Sean and defendant were friends, and the State argued the reasonable inference that defendant was angry and agitated on the evening that his friend had been shot in the street by three young males.

¶ 58    Defendant also complains that the State improperly insinuated that defendant was security for a street gang. Our review of the record, however, establishes that defendant's characterization of the State's argument is not accurate. According to the record, the defense argued during the course of the trial and in closing argument that: the recovered Ruger was actually one of the two guns Teddy had dropped in the street after he shot Sean; the physical evidence showed that defendant never had a gun and the police fired at him without any provocation; and Officers Chatman and Collier were liars, were the subjects of prior complaints by other civilians, and callously and carelessly shot defendant when he was inside the vestibule trying to protect the screaming women.

¶ 59    In rebuttal, the prosecutor responded that the Ruger should have been found on defendant in the basement, but the people on the 5300 block of West Congress Parkway "play a game *** called hide the gun." The prosecutor asserted that Shanice Wooden's and Dora Wooden's testimony–*i.e.*, that Teddy showed up on the block of a Four Corner Hustler, simultaneously fired the two guns he was carrying like a character in a Western movie, and then left one gun at the scene so Sean's sister could pick it up, chase him, and seek revenge–was not believable.

¶ 60    Further, the prosecutor argued that somebody must have gotten the Ruger out of 5331 West Congress Parkway undetected when the officers left the building unattended momentarily. The prosecutor said the Ruger could not have been the gun Teddy used to shoot Sean because Sean's friend, defendant, was linked to that gun by DNA testing and the

firearms evidence linked to the Ruger indicated that, if Teddy had used that gun, somebody would have had to reload it with one more bullet before it was tossed under the bush.

¶ 61    In response to the defense's claims that defendant was known by the residents of the 5300 block as a nice guy who did construction work in that area and had tried to shield the females in the vestibule from the gunfire, the prosecutor said it was more likely that defendant was "security" for the block based on Katrina Robinson's handwritten statement and grand jury testimony that defendant lifted his shirt to show off the gun he was carrying and let everyone know that was "controlling the block." The prosecutor continued:

> "There was trouble brewing back on that day, and it came to be. It ended in the shooting and paralyzation of [Sean] Wooden, his friend, not the police officer's friend. They didn't know [Sean] Wooden. They don't know him. Who's got a reason to be agitated and angry and aggressive on that night? This guy, (Indicating) because his buddy is paralyzed in a shooting. He's got his gun. When the officers are on the block in their covert vehicle, he thinks there is more trouble, and he is going to go take care of it for 5300 West Congress. That's why he went down there. But he bit off more than he can chew."

We conclude that these comments by the prosecutor were responses to defendant's arguments and reasonable inferences based on the evidence.

¶ 62    Next, defendant asserts the State improperly insinuated, without any basis in the evidence, that Katrina Robinson was afraid of defendant. According to the record, the prosecutor argued that Robinson "developed a sudden case of amnesia," "was not willing to be as forthcoming as she was when the defendant was not seated in a room with her," and that "sometimes people become less cooperative as time goes by." We conclude that the prosecutor argued that Robinson was putting on an act and going to great lengths to help defendant, and those were reasonable comments based on the discrepancies between her trial testimony and her prior handwritten statement and grand jury testimony.

¶ 63    Moreover, if any of the prosecutor's complained-of comments were improper, it could not reasonably have affected the result of the trial or contributed to defendant's conviction. Any improper remark by the prosecutor was not a substantial error, was subject to the corrective action of the trial court's instruction to the jury, and could not have swayed the jury in light of the overwhelming evidence of defendant's guilt. Specifically, Officers Chatman and Collier testified consistently and credibly that defendant confronted them with a gun, fired at them when they chased him down the block, and then pointed the gun at them again before he went into the vestibule. Furthermore, defendant's wounds and the firearms evidence recovered at the scene supported the officers' accounts of the shooting and chase. Although the DNA evidence did not establish that defendant handled the recovered Ruger, that evidence did link him to that gun where he could not be excluded from the 9% of the population that could have contributed to the partial DNA profile found on the gun. In addition, Katrina Robinson saw defendant display a gun earlier on the day of the shooting, and defense witnesses Shanice and Dora Wooden and Carrie Warfield were severely impeached by either their prior sworn statements, prior inconsistent statements, or prior deposition testimony.

-15-

¶ 64                              C. Ineffective Assistance of Counsel

¶ 65        Defendant claims that he received ineffective assistance from both trial and posttrial counsel. In order to obtain relief on his claims of ineffective assistance of counsel, defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Specifically, defendant must show not only that his lawyer's performance fell below an objective standard of reasonableness, but also that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-89; *People v. Albanese*, 104 Ill. 2d 504, 525-27 (1984). The competence of counsel is assessed in light of counsel's total performance (*People v. Ayala*, 142 Ill. App. 3d 93, 99-100 (1986)), and there is a strong presumption that the conduct of counsel falls within the wide range of reasonable professional assistance (*Strickland*, 466 U.S. at 689). The prejudice prong of the *Strickland* test may be satisfied if defendant can show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). The failure to satisfy either *Strickland* prong will preclude a finding of ineffective assistance of counsel. *People v. Johnson*, 368 Ill. App. 3d 1146, 1161 (2006).

¶ 66        Defendant argues that his trial counsel was ineffective for failing to impeach the testimony of Officers Chatman and Collier with deposition testimony from the civil case against them. According to defendant, the deposition testimony contained prior inconsistent statements, which would have damaged the officers' credibility and indicated that the police had immediately secured the exits of 5331 West Congress Parkway and thereby prevented anyone from removing or concealing the Ruger gun. Defendant also argues that counsel should have introduced into evidence a Chicago police department report that would have shown that very little time had elapsed from the time gunshots were fired to the time police units arrived at the scene.

¶ 67        These arguments lack merit. The report at issue contains hearsay statements by unidentified people and would not have been admissible. See 725 ILCS 5/115-5(c)(2) (West 2010) (police reports are not business records). Furthermore, defendant's counsel had transcripts of the civil case depositions, so there is no issue that they were ignorant of some potential evidence. Moreover, counsel did use the deposition testimony to impeach one of the officers on a different issue. Under the *Strickland* presumption, the record supports the conclusion that counsel chose not to use the civil case depositions for purported impeachment on minor discrepancies because it would not have helped defendant's case. Specifically, the evidence indicated that there was still time and opportunity for someone to get the Ruger out of the building or conceal it. Moreover, counsel's decision not to use the depositions in the manner urged by defendant on appeal avoided the risk of rehabilitation with information concerning the officers' prior consistent statements.

¶ 68        Next, defendant argues that trial counsel failed to object to the introduction of irrelevant firearms evidence unrelated to this case, failed to present the jumble of firearms evidence to the jury in an organized manner, and failed to effectively cross-examine forensic investigator Presnell and forensic scientist Brubaker to show that the firearms evidence could not be connected to defendant. We disagree. The record supports counsel's strategic choice to use the evidence of the earlier shooting of Sean Wooden at the same location to argue that the

-16-

police conducted a sloppy investigation in that case and that the shell casings linked to the Ruger actually came from the earlier shooting involving Sean.

¶ 69    Next, defendant complains that trial counsel's failure to object at any point during the DNA expert's testimony and failure to subject her conclusions to adequate cross-examination resulted in the jury's inability to properly weigh her conclusions and enabled the State to distort her testimony in rebuttal argument. Specifically, defendant argues the DNA expert testified about her conclusions but did not testify about matters that would have shown an adequate foundation for her conclusions. According to defendant, the expert's testimony was flawed because she did not state an adequate basis for her statistical calculations, did not explain how she conducted the DNA testing, did not state what testing method she used, did not explain what steps she took, did not describe which loci she analyzed, and did not explain how she arrived at her conclusion that defendant could not be excluded from the population that handled the Ruger. Defendant's argument, however, lacks merit.

¶ 70    An expert may base her opinion on information not admitted into evidence if that information is reliable and is of a type reasonably relied upon by experts in that field. *Wilson v. Clark*, 84 Ill. 2d 186, 193-96 (1981). "To lay an adequate foundation for expert testimony, it must be shown that the facts or data relied upon by the expert are of a type reasonably relied upon by [experts] in that particular field in forming opinions or inferences." *People v. Contreras*, 246 Ill. App. 3d 502, 510 (1993). Where the issue is admission of an expert's entire opinion, the trial court should liberally allow the expert to determine what materials are reasonably relied upon by those in his field. *People v. Lipscomb*, 215 Ill. App. 3d 413, 435 (1991).

¶ 71    Trial counsel's decision to object to testimony is generally a matter of trial strategy that is entitled to great deference and does not amount to ineffective assistance. *People v. Fender*, 325 Ill. App. 3d 168, 177 (2001). According to the record, the State gave the defense the expert's report during discovery, the expert testified from that report at the trial, and there has been no assertion in this case, either below or here on appeal, that the expert's report fails to establish a foundation for her conclusions. Furthermore, contrary to defendant's assertion on appeal, trial counsel *did* object during the expert's testimony to her statement that although there was not enough DNA to make a match to defendant and she did not have an expert opinion as to whether defendant could have handled the Ruger, based on the results of her testing, it was possible that defendant could have handled the Ruger. The trial court, however, overruled that objection.

¶ 72    Here, it was made clear that the jury was not being asked to accept an *opinion* that was short on supporting details–the DNA expert testified that she could *not opine* as to whether or not defendant could have handled the Ruger. In addition, counsel's decision to minimize the expert's conclusion instead of attacking her testing method or statistical calculations supported the defense strategy to argue that a large number of people–600 million–could have left the partial DNA sample found on the Ruger. Defendant does not argue on appeal that the expert would not have been able to support her conclusions; accordingly, counsel reasonably may have decided not to highlight or strengthen the expert's testimony before the jury by going into more detail about her testing method and analysis of the loci. Counsel chose instead to attack the significance of the DNA evidence on cross-examination and

during closing argument.

¶ 73    The record establishes that counsel conducted a clear and effective cross-examination of the DNA expert. Specifically, counsel questioned her about her inability to identify all 14 markers from the partial DNA profiles obtained from the swabs. Counsel also questioned her ability to conclude that defendant could not be excluded from the second set of swabs even though that sample had only one more identifiable marker than the inconclusive sample from the first set and swabs. Furthermore, counsel's cross-examination stressed that 600 million people could not be excluded as possible contributors from the sample, that this case did not involve a DNA match, that a case involving a DNA match is described very differently from this type of case, and the expert could not say to a reasonable degree of scientific certainty that only defendant handled the Ruger on the date in question. Moreover, counsel's cross-examination established that the database used by the expert did not include Asians and the expert's testing technique would not establish what race that DNA came from. Finally, as discussed in detail above, the State did not misrepresent or distort the DNA expert's testimony during closing argument (*supra* ¶¶ 49-56), and the evidence in this case was not closely balanced (*supra* ¶ 63).

¶ 74    Defendant cites *People v. Safford*, 392 Ill. App. 3d 212, 226-27 (2009), to support the proposition that reversal of a defendant's conviction is proper where the State fails to lay an adequate foundation for its expert's testimony and did not establish the specific process the expert undertook. Defendant's reliance on *Safford* is misplaced. In *Safford*, the court addressed whether the trial court committed reversible error when it allowed a fingerprint expert to testify to his conclusion that the defendant's fingerprint was on the windshield of a police car despite defense counsel's objection, prior to the expert's testimony, to any testimony by the expert on the basis that the expert's reports received in discovery did not list any points of comparison from which the expert could have drawn his conclusion of a match. *Id.* at 216-17. The issue in *Safford* does not match the issue before us. In *Safford*, defendant challenged the admissibility of the expert's opinion of a fingerprint match to the defendant where the expert never disclosed in discovery a foundation for his conclusions. Here, defendant does not fault his trial counsel for any failure to challenge the admissibility of the DNA expert's testimony based on a lack of foundation to support her conclusions; rather, defendant complains that counsel's choice not to put before the jury certain details concerning the expert's testing of the DNA and statistical analysis resulted in the jury being confused about how much weight to give the expert's testimony.

¶ 75    Furthermore, the *Safford* court was concerned that the lack of any foundation for the expert's conclusion in either his report or his testimony left the defendant without any real opportunity to challenge during cross-examination how the expert reached his conclusion. *Id.* at 223. Here, defendant does not allege that trial counsel was unable to cross-examine the expert due to the absence of any foundation in the expert's report. Moreover, as discussed above, counsel's cross-examination did challenge the significance and reliability of the expert's conclusions concerning the partial DNA profile. Counsel made clear to the jury that the DNA evidence did not make a match to defendant but merely indicated, based on a world population of 6 billion, that defendant could not be excluded from a group of 600 million people as possible contributors to the DNA mixture. The cross-examination on that point was

precise, clear and thorough. The weight to give the expert's testimony was a matter for the jury to decide and that is what it did.

¶ 76    Defendant also cites *People v. Schulz*, 154 Ill. App. 3d 358, 363 (1987), where there was no person who could identify the defendant as the murderer and the prosecution presented expert testimony that the defendant could not be excluded as a donor of seminal fluid found on the rectal swab taken from the victim. The court concluded that the evidence should have been excluded as irrelevant because it had no tendency to prove the defendant committed the crime where the blood and fluid test results failed to exclude the defendant from 20% of the population's possible enzyme secreting donors. *Id.* at 366.

¶ 77    *Schulz*, however, is distinguishable. In *Schulz*, the test results were a major portion of the evidence against the defendant and there were no eyewitnesses. Consequently, the court found that the absence of other corroborating evidence that would have narrowed the possible group of offenders rendered the test results inadmissible. *Id.* at 365-66. Here, defendant's identity was not in question, the DNA evidence was a minor portion of the evidence against him, and the police officers' testimony that defendant pointed a gun and fired at them was corroborated by the firearms evidence collected from the street. The DNA evidence was relevant because it tended to render more probable the disputed fact that defendant might have used the recovered Ruger to shoot at the officers, and tended to render less probable the assertion that the Ruger was simply Teddy's discarded gun from the earlier shooting incident. See *id.* at 366 ("Evidence will be considered relevant where the circumstance or fact offered tends to prove or disprove a disputed fact or render the matter in issue more or less probable."). Furthermore, defendant's assertion that the DNA evidence was more prejudicial than probative lacks merit. The fact that 600 million people could have contributed to the mixed DNA sample found on the Ruger was not detrimental to defendant's position that he did not handle the Ruger.

¶ 78    The dissent would have this court reverse defendant's conviction based upon grounds not raised by defendant on appeal. Specifically, the dissent concludes that counsel's representation was deficient for failing to move to exclude the DNA evidence. Defendant, however, did not argue that the DNA evidence was inadmissible or should have been excluded, and the State, accordingly, did not brief that issue. To the contrary, defendant argued that the jury was unable to properly weigh the expert's conclusions because counsel neither objected to the DNA expert's testimony, which–according to defendant–did not elaborate on the foundation for her conclusions, nor subjected her conclusions to an adequate cross-examination. As discussed above, trial counsel did raise an objection to the expert's conclusion and did adequately cross-examine her. Moreover, the record indicates that the State gave the defense the expert's report during discovery, and no evidence indicates that the expert could not have further explained the basis of her testimony. In addition, without the expert's report, the appellate record is insufficient for us to review any claim concerning the admissibility of the expert's testimony. See *People v. Wright*, 2012 IL App (1st) 073106, ¶ 107 (a reviewing court may decline to adjudicate a claim of ineffective assistance of counsel raised on direct appeal if it involves matters beyond the record on direct appeal).

¶ 79    Finally, the dissent's citation to *Wright*, 2012 IL App (1st) 073106, is misguided. Whereas the DNA evidence in *Wright* purported to show that a match had been made to the

defendant, here, in contrast, the State, the DNA expert, and defense counsel made clear to the jury that no match to defendant was made because the tested sample was a low level amount mixture of DNA.

¶ 80    In *Wright*, the DNA evidence constituted essentially the sole evidence used to identify the defendant from a felony database as the perpetrator of a sexual assault where the victim could not identify her attacker. *Wright* addressed the trial court's error in failing to order a pretrial DNA database search where the primary evidence to identify the defendant as the offender was a nine-loci analysis between his DNA and a male DNA profile obtained from the victim's rectal swabs. The database search request was made pursuant to section 116-5 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-5(a) (West 2006)), which requires a defendant to show only that "DNA evidence may be material to the defense investigation or relevant at trial." *Id.*

¶ 81    In *Wright*, the majority acknowledged the fact that they were *not* asked to determine whether the expert's conclusion of a "match" based on only nine-loci was correct but, instead, they had been asked to determine whether the trial court abused its discretion in denying the defense the ability to investigate and impeach that conclusion. *Wright*, 2012 IL App (1st) 073106, ¶ 86. In addition, the court addressed the defendant's claim that his trial counsel was ineffective in his handling of the pretrial DNA motion and for failing to hire an independent DNA expert. *Id.* ¶ 103. Specifically, the *Wright* majority concluded that counsel rendered ineffective assistance by asking the trial court to order a database search that had already been done and, moreover, had been done at the request of the same counsel. *Id.* ¶¶ 108, 113.

¶ 82    The facts and analysis in *Wright* are not pertinent to the instant case, which did not involve any testimony claiming a DNA match had been made and did not rely on the DNA evidence to identify an otherwise unknown offender. Here, the DNA evidence was a minor part of the State's case, and the State did not argue that the DNA evidence in and of itself established that the Ruger was defendant's gun. Rather, the State argued that it was circumstantial evidence and simply another piece of the puzzle for the jury to consider in whether there was a link between defendant and a gun that might have been involved in this case. Moreover, trial counsel cross-examined the DNA expert concerning the statistical meaning of the partial DNA profile comparison and argued before the jury that the DNA evidence should be given little weight. *Cf. People v. Watson*, 2012 IL App (2d) 091328, ¶ 25 (holding defense counsel's performance fell below an objective standard of reasonableness when counsel failed to probe the statistical meaning of a seven-loci match admitted against the defendant). In this case, trial counsel made clear to the jury that the DNA evidence was not a match and no conclusion could be made that defendant contributed to the DNA mixture found on the Ruger. At best, all the State's expert could state was that defendant could not be excluded from the 600 million people who could have contributed to that mixture and there was a possibility that he handled the Ruger.

¶ 83    Next, defendant argues trial counsel failed to preclude Katrina Robinson's prejudicial testimony and failed to impeach the reliability of her prior inconsistent statements. Trial counsel filed a written motion *in limine* on this issue, orally argued the motion, and then asked the judge to reconsider the ruling denying the motion. Defendant complains, however,

that trial counsel merely argued that Robinson's testimony about seeing defendant display a gun in the afternoon was highly prejudicial because it was too remote in time and irrelevant to the incident at 10:30 p.m. later that day. Defendant asserts counsel should have argued that Robinson's prior statements were inconsistent with each other and unreliable based on her age and the conditions under which she was questioned.

¶ 84     Defendant's argument lacks merit. If a prior inconsistent statement meets the requirements of section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2010)), it may be admitted as substantive evidence without an independent determination of its reliability or voluntariness. *People v. Barker*, 298 Ill. App. 3d 751, 761 (1998); *People v. Pursley*, 284 Ill. App. 3d 597, 609 (1996); *People v. Carlos*, 275 Ill. App. 3d 80, 84 (1995). Our review of the record indicates no meritorious basis for counsel to move the court to preclude Robinson's prior inconsistent statements on the basis of reliability.

¶ 85     Next, defendant argues that trial counsel failed to present exculpatory witnesses who would have testified that defendant did not have a gun. According to defendant, trial counsel knew that seven potential witnesses would have testified that defendant did not have a gun when they saw him either at the van or in the vestibule and three potential witnesses would have contradicted or contested Katrina Robinson's testimony that she saw defendant display a gun that afternoon. Trial counsel claimed that he interviewed those witnesses but decided to call only Shanice and Dora Wooden, and Carrie Warfield because the other potential witnesses would have either provided cumulative testimony, or contradicted one another, or been subject to impeachment. On appeal, defendant asserts that the missing testimony would not have been cumulative and trial counsel lied because several of the potential witnesses stated that he never contacted them.

¶ 86     Decisions involving what evidence to present and which witnesses to call fall within the broad category of trial strategy and are not subject to a claim of ineffective assistance unless they deprive a defendant of a meaningful adversary proceeding. *People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005). "Neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates the trial lawyer was incompetent." *People v. Negron*, 297 Ill. App. 3d 519, 538 (1998).

¶ 87     Defendant has not met his burden to overcome the presumption that counsel's decision not to call certain witnesses was a matter of trial strategy. During the hearing on the motion for a new trial, trial counsel, who had been practicing law for 31 years, testified that he spoke with defendant numerous times while this case was pending for 3½ years, went to the scene numerous times, took still photos and a video, had numerous conversations with defendant about the witnesses, had the deposition transcripts of the many witnesses in the civil case, and had interviewed several proposed witnesses. Counsel chose Carrie Warfield and Shanice and Dora Wooden as the strongest witnesses because using the other potential witnesses would have been harmful to defendant's case where they contradicted one another or were inconsistent with their deposition transcripts or provided merely cumulative testimony and were subject to impeachment. The trial judge heard counsel's testimony concerning his investigation of the potential witnesses and concluded that counsel's decision concerning which witnesses would be believable did not fall below the *Strickland* standard.

¶ 88        Defendant also argues that he was denied effective assistance of posttrial counsel, who failed to effectively present defendant's claims in the motion for a new trial. Specifically, defendant contests posttrial counsel's failure to effectively: contest the trial court's decision to give the jury a limiting instruction about other offenses despite trial counsel's objections; argue that trial counsel failed to present evidence that showed the police immediately secured the building after the shooting and failed to impeach the police officers with deposition testimony from the civil case; and rebut trial counsel's testimony that he met every potential witness provided by defendant. Defendant's complaints lack merit. The record establishes that posttrial counsel filed a comprehensive 17-page motion for a new trial that raised 7 main issues with numerous subparts. Moreover, posttrial counsel later filed a supplemental posttrial motion that raised seven more issues and included dozens of subissues. Furthermore, that supplemental motion incorporated by reference points "O" through "Z" of defendant's own *pro se* supplemental posttrial motion and the voluminous attachments to that motion. Posttrial counsel's strategic choices concerning which issues warranted argument were reasonable and did not result in any prejudice to defendant.

¶ 89        Defendant has failed to meet his burden under *Strickland*. The record establishes that defendant's experienced and privately retained trial counsel successfully moved *in limine* to preclude the State from presenting certain damaging testimony against defendant, presented a full and coherent defense, vigorously cross-examined the State's witnesses, and presented witnesses on defendant's behalf. Likewise, posttrial counsel filed a comprehensive motion for a new trial and selected its best issues for oral argument before the trial court. Furthermore, in light of the substantial evidence of defendant's guilt, as discussed above, defendant cannot establish a reasonable probability that the result of the trial would have been different if counsel had acted in accordance with the tactics proposed by defendant on appeal.

¶ 90                                   D. Defendant's Right to Testify

¶ 91        Defendant argues the trial court erred in denying his motion for a new trial because, according to defendant, he presented unrebutted evidence that one of his trial attorneys improperly coerced him to waive his right to testify. Specifically, at the hearing on defendant's motion for a new trial, he testified that cocounsel told him not to take the stand, said that defendant would corrupt his case if he testified, and threatened not to help him with his civil case because he would show, by testifying, that he did not know how to cooperate.

¶ 92        The record refutes defendant's claim of coercion. The decision to testify on one's own behalf belongs to the defendant but should be made with the advice of counsel. *People v. Youngblood*, 389 Ill. App. 3d 209, 217 (2009). According to the record, the trial court advised defendant of his right to testify and that it was his decision to make, and defendant then affirmed that he had decided not to testify. Moreover, defendant's allegations on appeal that cocounsel whispered to him and touched his hand during his waiver of his right to testify hardly constitute a showing of coercion by cocounsel. See *id.* ("Advice not to testify is a matter of trial strategy and does not constitute ineffective assistance of counsel unless evidence suggests that counsel refused to allow the defendant to testify."). Furthermore,

when defendant testified at his motion for a new trial, he admitted that when his trial attorney advised him not to testify based on his "big mouth," trial counsel nevertheless told defendant that it was ultimately defendant's decision to waive his right to testify. Likewise, lead counsel testified at the posttrial hearing that he discussed the issue numerous times with defendant and always told him that the waiver of his right to testify was defendant's decision. The trial court had the opportunity at the posttrial hearing to see and hear the witnesses when determining their credibility, and we find no error in the trial court's decision that defendant freely and voluntarily waived his right to testify.

¶ 93                         E. Jury Instruction Regarding Other Offenses

¶ 94    Defendant argues the trial court abused its discretion by giving the jury, over defense counsel's objection and after the parties had presented their evidence, a limiting instruction regarding proof of other offenses based on Katrina Robinson's testimony that she saw defendant with a gun earlier in the day. According to defendant, the instruction served only to highlight Robinson's flawed and prejudicial testimony, portray defendant as a bad person and insinuate that he must be guilty of the charged offense. Defendant also complains that, because the instruction did not specify the other offense, the jury was left to speculate about the offense and defendant's intent, design and knowledge. Posttrial counsel did not include this issue in the motion for a new trial, and defendant acknowledges the forfeiture but asks this court to review the issue for plain error. We conclude, however, that defendant's forfeiture notwithstanding, this claim lacks merit.

¶ 95    Jury instructions give the jurors the correct principles of law applicable to the facts so they can reach a correct conclusion according to the law and the evidence. *People v. Fuller*, 205 Ill. 2d 308, 343 (2002). In a criminal case, the applicable Illinois Pattern Jury Instruction "shall be used, unless the court determines that it does not accurately state the law." Ill. S. Ct. R. 451(a) (eff. July 1, 2006). In determining the adequacy of instructions, a reviewing court will consider all the instructions as a whole to ascertain if they fully and fairly cover the law. *People v. Housby*, 84 Ill. 2d 415, 433-34 (1981). An error in giving or refusing instructions will not warrant reversal where the evidence of the defendant's guilt is so clear and convincing that the jury could not reasonably have found the defendant not guilty. *People v. Jones*, 81 Ill. 2d 1, 9 (1979).

¶ 96    Here, the trial court gave the jury the following version of Illinois Jury Pattern Instructions, Criminal, No. 3.14 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 3.14):

> "Evidence has been received that the defendant has been involved in an offense other than those charged in the indictment. This evidence has been received on the issues of the defendant's intent, design and knowledge and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that offense, and if so what weight should be given to this offense on the issues of intent, design, and knowledge."

The committee note for this jury instruction recommends that "[a]t the time the evidence which is the subject of this instruction is first presented to the jury *** an oral instruction should be given to explain to the jury the limited purpose of this evidence, unless the

defendant objects to that instruction." IPI Criminal 4th No. 3.14, Committee Note, at 104.

¶ 97 According to the record, the trial court offered to give a limiting instruction to the jury when Katrina Robinson testified, but the defense objected. Accordingly, the court did not give the limiting instruction at that time but informed the defense that the instruction would be included in the jury instructions. When the issue arose again at the jury instruction conference, the defense again objected but the court gave the instruction over that objection.

¶ 98 Generally, other crimes evidence is admissible if it is relevant for any purpose other than to show the propensity to commit crime. *People v. Novak*, 163 Ill. 2d 93, 117 (1994). The version of IPI Criminal No. 3.14 at issue here fairly reflects the applicable law in this case, and we find no error in giving this instruction. Robinson testified that she saw defendant carrying a concealed firearm on the street. The complained-of instruction helped ensure that the jury properly considered the evidence only on the issues of intent, design and knowledge and not as evidence of defendant's criminal propensity. *People v. Foster*, 195 Ill. App. 3d 926, 950 (1990); *People v. Chrisos*, 151 Ill. App. 3d 142, 155 (1986).

¶ 99 Moreover, defendant's assertion that the trial court cannot override the defense's objection misstates the recommendation in the above-quoted committee note, which applies to the optional oral instruction at the time the evidence is presented, not to the final written instructions given to the jury at the end of the trial. Furthermore, defendant's claim that the jury was left to speculate about the unspecified offense lacks merit; the defense strategically chose this result when it asked the trial court not to give the instruction at the time Robinson testified. We conclude that the trial court appropriately exercised its supervisory power over the trial and gave the instruction after determining that it would best protect defendant and ensure the fairness of the trial. *Chrisos*, 151 Ill. App. 3d at 155.

¶ 100                    F. Compliance With Supreme Court Rule 431(b)

¶ 101 Defendant argues he should receive a new trial because the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). Specifically defendant complains that the trial court failed to (1) ensure that the potential jurors understood and accepted the principle that a defendant's decision not to testify cannot be held against him, and (2) present its questions to the venire about the other fundamental principles in separate questions. Defendant concedes that he has forfeited these issues by failing to both object at trial and include the issues in his posttrial motion. See *Enoch*, 122 Ill. 2d at 186. He argues, however, that these issues are reviewable under the first prong of the plain error rule (*supra* ¶ 50) because the evidence was closely balanced where the State and defense witnesses presented conflicting testimony.

¶ 102 We review the trial court's compliance with a supreme court rule *de novo*. *People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007). Rule 431(b) codified our supreme court's holding in *People v. Zehr*, 103 Ill. 2d 472, 477 (1984), that four inquiries must be made of potential jurors in a criminal case to determine whether a particular bias or prejudice would deprive the defendant of his right to a fair and impartial trial. Rule 431(b) requires the trial court to issue the *Zehr* admonitions and inquiries *sua sponte*. Specifically, the trial court must ask each potential juror, individually or in a group, whether that juror understands and accepts

the following principles: (1) that the defendant is presumed innocent; (2) that the State must prove him guilty beyond a reasonable doubt; (3) that he is not required to present evidence on his own behalf; and (4) that his decision not to testify may not be held against him. However, no inquiry of a prospective juror is made into the defendant's failure to testify when the defendant objects. Ill. S. Ct. R. 431 (eff. May 1, 2007). Although Rule 431(b) is designed to help ensure that defendants are tried before a fair jury, the *Zehr* questioning under that rule is not indispensable to a fair trial. *Thompson*, 238 Ill. 2d at 613-14.

¶ 103    The trial judge, in his opening remarks, stated the first three *Zehr* principles, *i.e.*, defendant's presumption of innocence, the State's burden of proof, and the principle that defendant is not required to prove his innocence or present any evidence on his behalf. Then, the judge separated the venire into groups of 12 for questioning. The judge asked the first group to shake their heads or give a verbal response if anyone would have a problem following the law. The judge noted that no one raised a hand and then asked if they understood and accepted the first three *Zehr* principles. After listing those principles, the judge again asked:

> "Do you all understand those principles apply to that case? Anybody have any problems with any of those principles, let me know please."

Then, the judge asked the group if they would be able to sign the appropriate form if the State met or failed to meet its burden of proof. The judge noted that no one raised a hand and allowed the attorneys to question the group. The judge followed the same procedure for the next groups, who gave verbal answers to the judge's questions. After the parties had presented their evidence, the trial judge informed the jury of all four *Zehr* principles as part of the jury instructions.

¶ 104    Defendant did not testify in this case, and error occurred here because the trial judge did not mention the fourth *Zehr* principle–*i.e.*, that the defendant's failure to testify cannot be held against him–when the judge questioned the venire about the three other *Zehr* principles. Defendant, however, is not entitled to a new trial because he cannot meet his burden to show that "the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him." *Herron*, 215 Ill. 2d at 187; see also *People v. Magallanes*, 409 Ill. App. 3d 720, 747 (2011) (where the trial court failed to question the venire about the fourth *Zehr* principle, the defendant failed to show plain error that would trigger a reversal of his conviction because the evidence was not closely balanced). As discussed above (*supra* ¶ 63), the evidence in this case was not closely balanced. Officers Chatman and Collier testified credibly and consistently that defendant confronted them while they were in the covert van, pulled out a gun and held it to Officer Collier's head, fired at them as they chased him down the street, and pointed the gun at them again before he went inside the vestibule. The firearms evidence collected at the scene and the location of defendant's wounds supported the officers' account of the incident and refuted the defense assertion that defendant was shot while he was in the vestibule protecting the screaming women. Although the DNA evidence did not establish that defendant handled the recovered Ruger, the DNA evidence did link him to that gun. In addition, the defense witnesses were impeached by the State.

¶ 105　　Furthermore, we reject defendant's assertion that the trial judge failed to comply with Rule 431(b) by collapsing his questioning concerning the three other *Zehr* principles into a single question. There is no special magic language that must be used to determine whether the potential jurors understand and accept the *Zehr* principles. *People v. Ware*, 407 Ill. App. 3d 315, 356 (2011). Ideally, it may be appropriate to question the venire about each *Zehr* principle in a piece-meal fashion, but separate questions are not mandated. Here, the trial court admonished the venire regarding those three *Zehr* principles and gave the venire an opportunity to disagree with them. The court's questioning was sufficiently broad so that if any potential juror had made a statement, raised a hand, or shaken his head in response to the question, it would have shown that he failed to understand or accept one of the *Zehr* principles and thereby prompted the trial court to inquire further. See *Magallanes*, 409 Ill. App. 3d at 729-30 (although the judge erred by failing to question the venire about the fourth *Zehr* principle, the judge satisfied Rule 431(b) concerning the three other principles by asking if anyone disagreed with those principles and, if so, to raise his hand); *Ware*, 407 Ill. App. 3d at 356 (court's inquiry as to whether venire members had "any difficulty" with the *Zehr* principles was sufficient compliance with Rule 431(b)); *People v. Davis*, 405 Ill. App. 3d 585, 589-90 (2010) (trial judge's inquiry as to whether venire members had "a problem" with the *Zehr* principles was sufficient compliance with Rule 431(b)). We find that the trial court's questioning of the venire concerning the three other *Zehr* principles sufficiently complied with Rule 431(b). In any event, defendant cannot meet his burden under the first prong of plain error analysis to establish that he is entitled to a new trial.

¶ 106　　　　　　　　　　　　　　　　　　　G. Sentencing

¶ 107　　The trial court sentenced defendant to concurrent 35-year prison terms for his attempted first degree murder of a peace officer convictions and added a sentence of 20 years for personally discharging a firearm for a total of 55 years' imprisonment. Defendant argues the trial court improperly imposed the 20-year sentencing enhancement for personally discharging a firearm contrary to the plain language of section 8-4(c) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/8-4(c) (West 2004)). Specifically, defendant, citing *People v. Douglas*, 371 Ill. App. 3d 21, 26 (2007), asserts that section 8-4 of the Criminal Code creates five independent crimes or offenses, each with its own sentencing scheme. According to defendant, attempt to commit first degree murder is sentenced as a Class X felony and, thus, subject to a term of 6 to 30 years' imprisonment, unless one of the four exceptions the legislature carved out in subsections (A), (B), (C) and (D) of section 8-4(c)(1) applies. Defendant asserts that those four exceptions are contained in separate, equally demarcated subsections of the attempt statute, and the plain, unambiguous language of the statute indicates that those four exceptions do not overlap.

¶ 108　　An issue of statutory construction is reviewed *de novo*. *People v. Taylor*, 221 Ill. 2d 157, 162 (2006). "Courts should consider the statute in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it." *Id.* The language of the statute is the surest and most reliable indicator of the legislature's intent; when the language is clear, it must be applied as written without resort to further aids or tools of interpretation. *Id.* Criminal statutes are to be strictly construed in favor of the accused, and nothing should

be taken by intendment or implication beyond the obvious or literal meaning of the statute. *Id.* The court cannot remedy an apparent legislative oversight by rewriting a statute in a way that is inconsistent with its clear and unambiguous language. *Id.* at 162-63. However, if the language of a statute is ambiguous, we may look to tools of interpretation, like *in pari materia*, to ascertain the meaning of a provision. *Id.* at 163.

¶ 109 The relevant portions of the statute at the time defendant was charged and sentenced are as follows:

"§ 8-4. Attempt.

(a) Elements of the Offense.

A person commits an attempt when, with intent to commit a specific offense, he does any act that constitutes a substantial step toward the commission of that offense.

\* \* \*

(c) Sentence.

A person convicted of an attempt may be fined or imprisoned or both not to exceed the maximum provided for the offense attempted but, except for an attempt to commit the offense [of armed violence] defined in Section 33A-2 of this Act,

(1) the sentence for attempt to commit first degree murder is the sentence for a Class X felony, except that

(A) an attempt to commit first degree murder when at least one of the aggravating factors specified in paragraphs (1), (2), and (12) of subsection (b) of Section 9-1 is present is a Class X felony for which the sentence shall be a term of imprisonment of not less than 20 years and not more than 80 years;

(B) an attempt to commit first degree murder while armed with a firearm is a Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court;

(C) an attempt to commit first degree murder during which the person personally discharged a firearm is a Class X felony for which 20 years shall be added to the term of imprisonment imposed by the court;

(D) an attempt to commit first degree murder during which the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, is a Class X felony for which 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 720 ILCS 5/8-4 (West 2004).

¶ 110 First, we do not accept defendant's assertion–and, by implication, the court's statement in *Douglas*–that section 8-4(c)(1) creates five different crimes or offenses. According to the plain, unambiguous language of the statute, section 8-4(a) sets forth the elements of the attempt offense; section 8-4(c)(1), under the heading "Sentence," states that the sentence for the offense of attempted first degree murder is the same as the sentence range for a Class X felony; subsection 8-4(c)(1)(A) presents aggravating factors that will increase the sentence range for that offense; and subsections (B), (C) and (D) of section 8-4(c)(1) simply set forth sentence enhancements that are added to whichever sentence range is applicable. If the

-27-

victim of the attempted first degree murder was a police officer, correctional agency employee, or medical assistance personnel, the Class X felony sentence range of 6 to 30 years is increased to 20 to 80 years. 720 ILCS 5/8-4(c)(1)(A) (West 2004). Then, if the defendant committed attempted first degree murder either while armed with a firearm, or by personally discharging a firearm, or by personally discharging a firearm that proximately caused great bodily harm, the court must add to defendant's sentence either 15 years, 20 years, or 25 years or up to a term of natural life, respectively. 720 ILCS 5/8-4(c)(1)(B), (C), (D) (West 2004).

¶ 111 The court in *Douglas* considered the same issue before this court. The defendant fired gunshots at police officers and was convicted of two counts of attempted first degree murder of a peace officer. At the 2004 sentencing hearing, the State informed the trial court that the firearm sentencing enhancement provisions did not apply, and the court agreed and sentenced the defendant to 2 concurrent 35-year terms. *Douglas*, 371 Ill. App. 3d at 23. On appeal, the defendant asked the court to reduce his conviction, and the State argued, for the first time, that the 35-year sentences were void because the mandatory 20-year enhancement for discharging a firearm was not imposed. *Id.* Specifically, the State argued that the Illinois Supreme Court, in *People v. Sharpe*, 216 Ill. 2d 481 (2005), overruled the line of cases that had utilized the cross-comparison analysis and invalidated penalties based on findings that the penalties violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). *Douglas*, 371 Ill. App. 3d at 24. The State asked the court to remand the cause for a resentencing hearing to apply the mandatory 20-year enhancement.

¶ 112 The *Douglas* court rejected the State's argument on two grounds. First, *Douglas* ruled that *Sharpe* did not apply retroactively because it did not announce a new constitutional rule to criminal cases pending on direct review. *Id.* at 24-25. That ruling in *Douglas*, however, has been invalidated by the supreme court's subsequent holding "that the rule announced in *Sharpe* is of constitutional dimension." *People v. Hauschild*, 226 Ill. 2d 63, 78 (2007). See also *People v. Lee*, 376 Ill. App. 3d 951, 960-64 (2007) (general discussion of the application of *Sharpe* to penalty enhancement challenges under the proportionate penalties clause).

¶ 113 *Douglas*'s second basis for rejecting the State's voidness argument was its construction of section 8-4(c)(1) of the Criminal Code. The court stated that the plain, unambiguous language of the statute established that the offense of attempted first degree murder of a peace officer is contained in section 8-4(c)(1)(A), which has no sentencing enhancement; instead, the sentencing enhancements for attempted murder concerning a firearm are contained in subsections (B), (C), and (D). *Douglas*, 371 Ill. App. 3d at 26. The court summarily concluded that the firearm sentencing provisions did not apply to the offense of attempted murder of a peace officer and the "legislature well might have believed" that the severe sentence available for that offense indicated that it was already enhanced and there was no "need for further provision." *Id.*

¶ 114 *Douglas* is not persuasive. *Douglas*'s construction might be plausible if subsection (A) was removed from section (c)(1) and instead designated as section (c)(2), and if the firearm sentencing enhancements in subsections (B), (C) and (D) immediately followed paragraph (c)(1). That, however, is not how the legislature drafted this statute. There is no punctuation separating paragraph (c)(1) from paragraph (c)(1)(A), but a semicolon follows paragraph (c)(1)(A). The plain and ordinary meaning of that text is that the sentencing range for the

attempted murder offense is 6 to 30 years unless an aggravating factor, like the defendant trying to kill a police officer, is present and then the sentencing range is higher, *i.e.*, 20 to 80 years. Just as the firearm sentencing enhancements in subsections (c)(1)(B), (C), and (D) must be added to the 6- to 30-year sentencing range, so too must those enhancements be added to the higher 20- to 80-year sentencing range. Furthermore, a defendant may attempt to murder a police officer by many means other than a firearm, and where subsection (c)(1)(A) makes no reference to firearms, the court should not speculate that any concerns about the use of firearms in perpetrating this offense have already been considered by the legislature and are accounted for by the 20- to 80-year sentencing range. See *People v. Tolentino*, 409 Ill. App. 3d 598, 606 (2011).

¶ 115    After *Douglas*, this court concluded in *Tolentino*, 409 Ill. App. 3d at 606, that the firearm sentencing enhancements applied to the sentence for the offense of attempted first degree murder of a peace officer. *Tolentino* declined to follow *Douglas* and stated that the statute did not expressly prohibit the use of the firearm enhancements when sentencing under subsection (A). *Id. Tolentino* also noted that the policy concerns underlying subsection (A)–*i.e.*, deterring the intentional killing of police officers, who take heightened risks in performing their duties–differed from the policy concerns underlying subsections (B), (C), and (D)–*i.e.*, deterring the use of firearms in the commission of felonies due to the greater risk their use poses to society at large. *Id.* at 605-06.

¶ 116    Like the court in *Tolentino*, we conclude that the trial court did not err in applying the firearm sentencing enhancement to defendant's sentence.

¶ 117    Next, defendant argues the mittimus should be amended to reflect 2,201 days in presentence custody. The State made no response to this argument.

¶ 118    According to the record, defendant was arrested on June 27, 2004, and sentenced on July 7, 2010, and received 2,196 days of presentence custody credit. Defendant, however, should have received 2,201 days of presentence custody credit, which does not include the date of sentencing. See *People v. Williams*, 239 Ill. 2d 503, 510 (2011). Accordingly, we direct the circuit court to correct the mittimus to reflect 5 more days of presentence custody credit, for a total of 2,201 days.

¶ 119                                    III. CONCLUSION

¶ 120    For the reasons stated above, we affirm the judgment of the trial court and order the correction of the mittimus.

¶ 121    Affirmed; mittimus corrected.

¶ 122    JUSTICE GORDON, dissenting.

¶ 123    In the case at bar, the State stated repeatedly during its closing argument that defendant's "partial DNA" was on a gun recovered near the crime scene. For the reasons stated below, I find this statement both factually wrong and horribly misleading.

¶ 124    In addition to challenging the prosecutor's remarks, defendant also claims that his

counsel was ineffective for failing to object to the introduction of the DNA evidence, as more prejudicial than probative. I cannot understand what probative value this evidence had, since the State's DNA expert testified that she had no opinion at all about whether defendant had handled the gun in question and that hundreds of millions of people could have been the one to handle it. However, its potential for prejudice was aptly demonstrated by the prosecutor's repeated and incorrect remarks. As a result, I would reverse and remand for a new trial.

¶ 125    Thus, I must respectfully dissent.


¶ 126                                BACKGROUND

¶ 127    There is no dispute that, on June 27, 2004, at approximately 10:30 p.m., two police officers shot defendant three times and shot a passerby once. Defendant was shot three separate times, in his chest, arm and leg; and a bullet was later removed from his upper back. Another bullet was also later removed from the upper back of the passerby, 13-year-old Chantel Davidson. The officers acknowledged at trial that their actions had been the subject of a police investigation and were also the subject of a pending civil suit. In addition, after defendant moved to suppress his statement as involuntary, the State agreed not to use it.

¶ 128    Earlier that same evening, at approximately 7 p.m., there had been a shooting on the 5300 block of West Congress Parkway, and Officers Calvin Chatman and Dwayne Collier were dispatched to the area to conduct surveillance on a particular vehicle. Other police personnel and another police vehicle were also present on the same block.

¶ 129    At trial, the officers testified that defendant walked over to the undercover van in which they were sitting and that, after they identified themselves as police officers, he pulled a gun out from under his jersey and held it to Officer Collier's head through the vehicle's open window. The officers testified that Officer Chatman then shot toward defendant's chest; defendant fell but rose and ran; and the officers chased defendant, who was shot a total of three times.

¶ 130    In stark contrast to the officers' testimony, defense witnesses testified that defendant was walking down the street at night with a bottle of 7-Up, when the officers chased and shot him.

¶ 131    The testimony at trial was a credibility contest between the officers on one side and the residents of the neighborhood on the other side. There were no fingerprints obtained from a gun recovered in the area, and there was no gunshot residue testing performed on defendant's hands to establish whether he had fired a gun. The only forensic evidence presented at trial was the DNA testimony that is at issue on this appeal.

¶ 132    At trial, Davere Jackson, a DNA analyst, testified that she received a buccal swab that had been swabbed inside of defendant's mouth, as well as swabs that had been swabbed on different areas of a gun recovered near the crime scene. Jackson testified that she was able to "generate" a DNA profile for defendant using the buccal swab. Jackson testified that, typically, she looks at "14 areas on the DNA" and that she did that in generating defendant's profile.

¶ 133    Jackson testified that she received two sets of swabs for the gun. One set of swabs, which

-30-

was labeled exhibit 37A, was collected from the left-side handle, the trigger guard, the magazine release and the hammer spur. A second set of swabs, which was labeled exhibit 38A, was collected from the right-side handle, the safety lever, the trigger guard and the butt of the magazine.

¶ 134     Jackson testified that, from exhibit 37A, she was able to identify a mixture of human DNA profiles, which were contributed by at least two people. Jackson testified that, since it was a low-level mixture and since she was not able to differentiate between one person and another, this mixture could not be used to identify a person and could only be used to exclude a person. She testified that she could draw no conclusion about whether or not defendant could have contributed to the mixed profile found on exhibit 37A.

¶ 135     Jackson testified that, from exhibit 38A, she was able to identify another mixture of human DNA profiles, which were contributed by two people. As a result, we know that at least two people handled this gun.

¶ 136     In addition, it is possible that there were other people who handled the gun but who left no DNA material on it. The expert explained that there were a lot of factors that would affect whether a person's DNA was transferred from his or her skin to an object, such as whether his or her skin was clean or had lotion or dirt, whether the skin had cuts or abrasions, and whether the skin was in contact with the object for a short or long time. Thus, there were two people and possibly more who handled this gun.

¶ 137     Of the people who left DNA material on the gun, their material had become mixed up with others who had also left material on the gun, thereby creating mixtures of DNA.

¶ 138     From one of the two mixtures found on the gun, the DNA analyst was able to extract part of a profile of one of the individuals who handled the gun. Specifically, Jackson testified that, from exhibit 38A, she was able to identify six "areas" or loci from one profile.

¶ 139     Although Jackson testified that typically she looks at 14 areas, she testified that she was only looking for 10 areas from the DNA on exhibit 38A. Jackson did not explain why she was looking for only 10 areas with respect to the gun, when she had looked for and had already found all 14 areas in the DNA material provided by defendant.

¶ 140     Although Jackson testified that the testing methods used by the Illinois State Police were generally accepted in the scientific community, she was not asked whether the methods employed in this case were generally accepted. Specifically, she did not state whether her "testing technique," as she called it, for looking at only 10 areas was generally accepted.

¶ 141     From exhibit 38A, Jackson testified that, of the 10 areas that she looked for, she found only 6. When Jackson considered this 6-loci profile and defendant's 14-loci profile, Jackson could conclude only that defendant could not be excluded as a possible contributor.

¶ 142     Jackson then used the six-loci profile to make statistical calculations. She testified that: 1 in 11 unrelated blacks could also not be excluded; 1 in 21 unrelated whites could also not be excluded; and 1 in 11 unrelated Hispanic individuals could not be excluded. In other words, one in 11 blacks would share this same profile at 6 loci. If more loci were added, then more people would be excluded. *People v. Wright*, 2012 IL App (1st) 073106, ¶ 54 (see generally the explanation by the director of Illinois DNA database of how DNA analysis works).

¶ 143    Jackson's calculations concerned only unrelated individuals. Her testimony means that there is a 1 in 11 chance that a black individual–or one of his aunts, uncles, nieces, nephews, siblings or cousins who may share these same six DNA areas–left the partial profile on the gun.

¶ 144    No evidence was submitted at trial about whether any of defendant's aunts, uncles or cousins lived on the same block.

¶ 145    The expert testified that there was the same chance that the contributor was Hispanic as there was that he was black: the same 1 in 11 chance. Also, the expert found a 1 in 21 chance that the contributor could have been white.

¶ 146    In addition, the expert gave her statistical conclusions in terms of "black[s]," "white[s]" and "Hispanics" without defining these terms. Where someone is of both African American and Caucasian descent, the expert did not explain whether this person would be counted twice, or not at all, or placed in one category; and which category this person would be placed in, if placed in a category. She did not explain whether a black from Latin America would be placed in the "black" or the "Hispanic" category. She offered no statistical calculations for people of biracial or multiracial heritage or for Asian Americans.

¶ 147    When asked whether the 1 in 11 statistic referred to males, the expert stated that she "did not say male" and that she could say only "one in eleven." She also testified that "our testing technique" could not differentiate among African American, Caucasian, Asian or Hispanic. As a result, she could not testify whether the contributor of the partial profile was male or female; or whether he or she was black, white, Hispanic or Asian.

¶ 148    Realizing all the problems with the DNA evidence, the expert concluded that she could not reach a scientifically valid opinion as to whether defendant handled the gun. Jackson explained that, since she was doing calculations with "only six areas," "this lowers the statistical value" of her conclusions. As a result, Jackson testified–unequivocally–that she had no opinion at all as to whether defendant could have handled this gun:

> "ASSISTANT STATE'S ATTORNEY [ASA] PAPA: Do you have an opinion as to whether or not [defendant] could have handled this gun?
>
> JACKSON: No, I don't have an opinion.
>
> ASA: Let me ask you this: Based on the results of your testing, is it possible that the defendant could have handled this gun?
>
> MR. WAGNER: Objection.
>
> THE COURT: Overruled.
>
> JACKSON: It's possible."

When the prosecutor asked if it was "possible," the expert did say that it was "possible." But practically anything is possible. *People v. Morquecho*, 347 Ill. App. 3d 382, 388-89 (2004) ("Anything is 'possible,' but not everything is 'probable.' "). The defense attorney later asked her whether it was possible that a juror could also not be excluded as a potential contributor based on the limited six-loci profile. But the trial court barred her from answering that question. If she had been allowed to answer, the jury may have understood the absurdity of asking a scientist whether something is "possible." On cross-examination, she was asked

-32-

"[w]hen the [S]tate's [A]ttorney asked you if something was possible, you're a scientist, you don't deal in those types of terms, do you?" She agreed.

¶ 149    Jackson testified that 1 in 11 is about 9%. Thus, 9% of unrelated blacks could have possibly contributed to the DNA found on the gun. On cross-examination, Jackson also agreed that, if one assumed a world population of 6 billion people, then she could not exclude 600 million people as being possible contributors.

¶ 150    Despite the expert's testimony, the State asked the jury, at least three different times during its rebuttal closing, to think about why defendant's "partial DNA" was found on the gun. The first reference to "[h]is *** partial DNA" came in the following paragraphs:

"Okay. This gun, they are going to say this gun was used in the first shooting, and it was just one incident where the guy shot?

Well, let's think about that for a second. Shawn Wooden [*sic*], a Four Corner Hustler, gets shot. *His buddy's partial DNA is on the gun*. That doesn't make any sense. If someone shot him with his gun, they would have had to reload it." (Emphasis added.)

¶ 151    The prosecutor then reiterated:

"If this is a gun being used to shoot at Shawn Wooden [*sic*], his buddy, *why is his partial DNA on it?*" (Emphasis added.)

¶ 152    Then, for a third time, the prosecutor observed:

"But, like my partner told you, when that gun's recovered, they don't know it's going to come back *with a partial DNA on Seneca Smith*." (Emphasis added.)

The rebuttal closing was the last argument the jury heard before retiring to deliberate.


¶ 153                                    ANALYSIS

¶ 154    On this appeal, defendant makes two claims with respect to the DNA evidence.

¶ 155    Defendant claims, first, that his counsel was ineffective for failing to object to the introduction of the DNA evidence. Specifically, defendant claims that his counsel should have objected on the grounds that the DNA expert failed to lay a proper foundation for her conclusions and that her testimony was more prejudicial than probative. In the case at bar, the expert's conclusions were that she had no opinion at all about whether defendant handled the gun and that hundreds of millions of people could have possibly been the one to handle it. For the reasons explained below, I find that counsel was ineffective for failing to move to object to the DNA evidence on the ground that its probative value–which even the State's expert admitted was low–was outweighed by its potential for prejudice and confusion, as demonstrated by how it was used, or misused, during the State's closing.

¶ 156    Second, defendant claims that the State committed misconduct when it stated repeatedly, and incorrectly, during its closing argument that defendant's "partial DNA" had been found on a gun recovered near the crime scene.

¶ 157    For the reasons stated below, I would find, first, that counsel was ineffective for failing to object to the DNA evidence on the ground that its very low probative value was outweighed by its very high potential for confusion and prejudice and, second, that the State

committed misconduct when it repeatedly misstated the expert's conclusion, or lack thereof. For these reasons, I would reverse and grant a new trial.

¶ 158                                    I. DNA Issues Raised

¶ 159    As a preliminary matter, I must address the fact that the majority accuses the dissent of raising a claim not raised by defendant: namely, that his counsel was ineffective for failing to object to the expert's testimony once the expert failed to lay an adequate foundation. *Supra* ¶ 78. Specifically, the majority asserts that "defendant does not fault his trial counsel for any failure to challenge the admissibility of the DNA expert's testimony based on a lack of foundation." *Supra* ¶ 74. Similarly, the majority asserts that defendant does not argue that "counsel's representation was deficient for failing to move to exclude the DNA evidence." *Supra* ¶ 78.

¶ 160    Defendant's claims are clearly laid out in the headings of his appellate brief and are further developed in the text. In his headings, he states that he "was denied effective assistance of counsel when his counsel *** allowed the introduction of misleading and irrelevant evidence." In a subheading, defendant stated that his counsel "failed to object [to] *** the testimony of the expert DNA analyst when she failed to lay an adequate foundation for her conclusions." Developing these headings in the body of the brief, defendant argued that his counsel should have objected to the expert's testimony once she stated that "she had a very low level of DNA" and thus was able to look at only six areas. Defendant argued that "only having six loci is too few to make any useful conclusions." Defendant asserted that counsel "failed by not objecting to Jackson's testimony, which resulted in the jury hearing her unsupported and prejudicial conclusions."

¶ 161    In addition to attacking the lack of a foundation, defendant's appellate brief also argued repeatedly that "Jackson's testimony was lacking in probative value," that "Jackson's testimony was far more prejudicial than probative" and that her testimony was "objectively unreasonable and prejudiced" defendant.

¶ 162    Defendant ended this section of his brief by arguing that: "Given that the evidence in this case was closely balanced, Jackson's testimony could have been what tipped the scales of justice in favor of the jury finding Smith guilty beyond a reasonable doubt, and therefore, Smith was denied a fair trial when his counsel failed to object to Jackson's testimony." In response, the State observed in its brief that "the issue is admission of an expert's opinion," and that the "trial court's decision concerning whether evidence is relevant and admissible" is within the trial court's discretion.

¶ 163    Similar to his appellate brief, defendant's posttrial motion, which was filed by new counsel, had a heading entitled: "Ineffective Assistance of Counsel–Failure to Object to DNA Evidence." In this section, defendant argued that "the DNA evidence introduced was not relevant, was prejudicial, was distorted and should have been objected to before trial. The failure to do so constitutes the ineffective assistance of counsel."

¶ 164    Defendant's briefs to the trial court and on appeal leave little question that defendant raised the issue that his counsel was ineffective for failing to object to the expert's testimony.

¶ 165                    II. Ineffective Assistance of Counsel

¶ 166    As the majority observes, to establish a claim of ineffective assistance of counsel, a defendant must prove both (1) deficient performance by counsel and (2) prejudice to defendant. *People v. Smith*, 195 Ill. 2d at 187-88 (citing *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984)).

¶ 167    To satisfy the first prong of the *Strickland* test, a defendant must show that his counsel's performance fell below an objective standard of reasonableness, as measured by prevailing norms. *Smith*, 195 Ill. 2d at 188. In considering whether counsel's performance was deficient, a court must indulge a strong presumption that the challenged action, or inaction, was the result of sound trial strategy. *Smith*, 195 Ill. 2d at 188.

¶ 168    To satisfy the second prong, a defendant must establish a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Smith*, 195 Ill. 2d at 188 (citing *Strickland*, 466 U.S. at 694). A probability rises to the level of a "reasonable probability" when it is sufficient to undermine confidence in the outcome or the proceeding. *Smith*, 195 Ill. 2d at 188. Counsel's deficient performance must have rendered either the outcome unreliable; or the proceeding fundamentally unfair. *Smith*, 195 Ill. 2d at 188.


¶ 169                          A. Deficient Performance

¶ 170    First, defendant has shown that counsel's failure to object to the admission of the DNA evidence fell below an objective standard of reasonableness, as measured by prevailing norms. *Smith*, 195 Ill. 2d at 188.

¶ 171    Our supreme court has held that, even when a particular type of scientific evidence such as DNA testing has been generally accepted in the scientific community, its admissibility "in an individual case will depend on the State's ability to lay a proper foundation and to demonstrate the qualifications of its witness, subject to the balancing of probative value with the risk of unfair prejudice." *People v. McKown*, 236 Ill. 2d 278, 314 (2010).

¶ 172    Prevailing norms required counsel to consider whether the State had satisfied its burden to lay a proper foundation and whether the probative value of the evidence outweighed its risk of unfair prejudice. *People v. Watson*, 2012 IL App (2d) 091328, ¶ 25 (defense counsel was ineffective for failing to probe the statistical meaning of an alleged seven-loci "match"). *Cf. People v. Wright*, 2012 IL App (1st) 073106, ¶ 101 (trial court committed plain error when it barred defense counsel from developing evidence to contest a claimed nine-loci "match").

¶ 173    The need for defense counsel to consider the propriety of the foundation and the risk for potential prejudice is particularly acute when the State is seeking to admit evidence of a partial profile. As this court observed earlier this year, "[t]he dangers of partial matches have been known for over a decade." *Wright*, 2012 IL App (1st) 073106, ¶ 83. For example, like the case at bar, the highly publicized English case of Raymond Easton also involved a six-loci partial profile. *Wright*, 2012 IL App (1st) 073106, ¶ 83. In 1999, Easton was charged with burglary after his DNA "matched" the DNA found at the crime scene at only six loci. *Wright*, 2012 IL App (1st) 073106, ¶ 83. However, when the police realized that Easton had

both advanced Parkinson's disease and an alibi, they ran a test at further loci and discovered that his DNA did not match at all. *Wright*, 2012 IL App (1st) 073106, ¶ 83.

¶ 174    The overwhelming public confidence in DNA evidence necessitates a corresponding vigilance by the defense bar. As we previously observed, DNA evidence is "a type of evidence that juries and courts alike find highly persuasive." *Wright*, 2012 IL App (1st) 073106, ¶ 96. See also *In re T.W.*, 402 Ill. App. 3d 981, 992-93 (2010) (finding that DNA evidence alone constituted "overwhelming" evidence, even when defendant looked nothing like the victim's description of the assailant); *People v. Johnson*, 389 Ill. App. 3d 618, 619 (2009) (finding that an expert's testimony about a DNA match was "overwhelming" evidence). DNA evidence has an almost " 'mystical aura.' " *Wright*, 2012 IL App (1st) 073106, ¶ 96 (quoting Joel D. Lieberman, *et al.*, *Gold Versus Platinum: Do Jurors Recognize the Superiority and Limitations of DNA Evidence Compared to Other Types of Evidence?*, 14 Psych. Pub. Pol. & L. 27, 33 (2008) (this article was published by the American Psychological Association and it summarized conclusions from three different studies concerning the impact of DNA evidence on a jury)). " 'Public jurors, on average, rated DNA evidence as 95% accurate, and it was rated as 94% persuasive of a suspect's guilt.' " *Wright*, 2012 IL App (1st) 073106, ¶ 96 (quoting Lieberman, *supra*, at 52-53).

¶ 175    In the case at bar, there was simply no strategic reason for failing to object to the admission of this testimony.[1] The particular DNA evidence at hand had almost no probative value as an identification tool. The State's expert testified to that fact when she stated, based on this evidence, she herself could offer no opinion as to whether this defendant handled this gun.

¶ 176    This was not a case where there was evidence that two individuals had handled a gun and the State's purpose was to exclude one. Here, the prosecutor was using the DNA evidence not to exclude but rather as a means of identifying defendant from the population of the rest of the neighborhood. It was to this attempt that, based on her analysis of the statistics, the expert found no scientifically valid opinion was possible.

¶ 177    Like Justice Freeman did in *People v. Schulz*, 154 Ill. App. 3d 358 (1987), I would find that the expert's testimony is totally lacking in probative value. In *Schulz*, an expert testified that the semen at issue came from a "nonsecretor," or someone whose blood type is not

---

[1]To support its conclusion that the failure to object was a matter of trial strategy, the majority asserts that, "[a]ccording to the record, the State gave the defense the expert's report during discovery." *Supra* ¶¶ 71, 78. However, there is nothing in the record that specifically confirms that the State provided the expert's report during discovery. On June 2, 2005, the prosecutor stated orally and in open court that the Illinois State Police had not yet forwarded the DNA report to him. There is no statement on a further court date confirming that the prosecution specifically provided the DNA report; and, as the majority observes, the expert's report does not appear in the appellate record. *Supra* ¶ 78. In addition, the expert had since moved to Arizona and initially refused to appear in Chicago. The State had to move the trial court for a subpoena as a material witness in order to secure her appearance at trial. Thus, contrary to the majority's assertion, it is not clear from the record when or if the DNA expert's report was provided to the defense. However, the lack of a report does not bar us from deciding the issues on appeal, since the expert testified from her report at trial.

evident in his bodily secretions. *Schulz*, 154 Ill. App. 3d at 363. The expert further testified that only 20% of the general population are nonsecretors and that defendant was a nonsecretor. *Schulz*, 154 Ill. App. 3d at 363. Justice Freeman held that, since this testimony "demonstrated nothing more than that defendant could not be excluded," it "served no relevant purpose, was totally lacking in probative value, and thereby prejudiced defendant's case." *Schulz*, 154 Ill. App. 3d at 366 (cited with approval in *Wright*, 2012 IL App (1st) 073106, ¶ 81). Since approximately half the population is male, the semen in *Schulz* could have come from only 10% of the general population. This 10% figure–which the *Schulz* court found to be "totally lacking in probative value"–is almost the same as the 9% figure used in the case at bar. Like we did in *Schulz*, I would find that this testimony lacked any probative value.

¶ 178    The majority attempts to distinguish the reversal in *Schulz* by arguing that the remaining evidence in *Schulz* was much weaker than the remaining evidence in our case, and that is what led Justice Freeman to reverse. *Supra* ¶ 77. Actually, the remaining evidence in *Schulz* was much stronger. In *Schulz*, the State's evidence established that, on the night of the murder, defendant was heard and seen arguing and fighting with the victim, the victim was last seen with defendant near the time of her death, and defendant admitted to the killing on several occasions. *Schulz*, 154 Ill. App. 3d at 373. Also, in *Schulz*, there was no doubt that a murder had occurred. *Schulz*, 154 Ill. App. 3d at 374 (the victim's body was found). The *Schulz* court found this evidence sufficient to prove defendant guilty of murder beyond a reasonable doubt, for double jeopardy purposes. *Schulz*, 154 Ill. App. 3d at 362. By contrast, in our case, there was no evidence of a motive for defendant's alleged, almost suicidal decision to open fire on police officers, and there were no admissions by defendant to allegedly shooting at the officers. In addition, there was a question about whether a crime had even occurred. Thus, the remaining evidence in *Schulz* was much stronger than in our case, and so our case presents an even more compelling case for reversal.

¶ 179    Although the DNA evidence had almost no probative value, it had great potential for prejudice and for confusing the jury. That potential came to actual fruition when the prosecutor repeatedly asked the jurors why "his partial DNA was on it [the gun]."

¶ 180    Thus, I find that defendant satisfied the first prong of the *Strickland* test, namely, to show that counsel's performance was deficient. *Smith*, 195 Ill. 2d at 188.


¶ 181                                    B. Prejudice

¶ 182    Second, I find that defendant has established a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Smith*, 195 Ill. 2d at 188 (citing *Strickland*, 466 U.S. at 694). As stated above, a probability rises to the level of a "reasonable probability" when it is sufficient to undermine confidence in the outcome or the proceeding. *Smith*, 195 Ill. 2d at 188. I find that the prejudice in this case undermines confidence in the verdict. *Schulz*, 154 Ill. App. 3d at 366 (a serologist's testimony that defendant merely "could not be excluded" prejudiced defendant's case and required reversal of his murder conviction).

¶ 183    In the case at bar, the trial was essentially a credibility contest between the officers on

one side and the residents of the neighborhood on the other. The officers testified that defendant approached their undercover van, when there were other officers and police vehicles also present on the same block; and then, after they identified themselves as police officers, defendant held a gun to an officer's head. That is practically suicide, and it almost was. Defendant was shot three times, including in the chest.

¶ 184    By contrast, the residents testified that defendant was walking down the street at night carrying a dark green soda bottle when the officers chased him and started shooting. The inference is that the officers were nervous after the shooting and that they mistook the bottle for a gun. This is a reasonable inference to draw.

¶ 185    In light of the other evidence, the misuse of the DNA evidence could have been what tipped the scales of justice against defendant. *Cf. People v. Safford*, 392 Ill. App. 3d 212, 225 (2009) ("Fingerprint evidence is extremely persuasive. A jury may be so swayed by such evidence that strong alibi witnesses have little chance of being found credible ***.") Its repeated misuse during the State's closing is discussed in the section below.

¶ 186                                    III. Prosecutor's Closing

¶ 187    As stated above, I find that the prosecutor repeatedly misused the DNA evidence during the State's rebuttal closing and that this error may have tipped the scales in this closely balanced case.

¶ 188    I agree with the majority that a prosecutor is allowed wide latitude during closing argument, and that he or she may draw any fair and reasonable inferences that the evidence permits. *Supra* ¶ 47. Where we differ is that the majority finds that the prosecutor's repeated assertions that this defendant's partial DNA was found on the gun were a reasonable inference (*supra* ¶ 51), while I find that these repeated assertions were inaccurate and completely misleading.

¶ 189    As I already discussed above, the expert concluded that she had no opinion at all about whether defendant handled the gun and that hundreds of millions of other people could have possibly been the one to handle it. Despite the expert's unequivocal testimony, the prosecutor misstated the DNA evidence not once but at least three times. First, the prosecutor told the jury: "His *** partial DNA is on the gun." Then he demanded of the jury: "why is his partial DNA on it?" Next, he stated again that the gun "c[a]me back with a partial DNA on" defendant.

¶ 190    Since, as I explained in the prior section, I find that the evidence was closely balanced and that the misuse of the DNA evidence could have been the deciding factor, I would grant a new trial and I must dissent.

¶ 191    Deterrence is a goal of our criminal justice system. However, only accurate convictions lead to deterrence. If, hypothetically, an entire neighborhood knows that an innocent man has been convicted, that leads not to deterrence but to a what-the-heck attitude toward committing crime. Due process protects not only the defendant and the criminal justice system but it also protects our streets.

¶ 192    As a result, I will keep writing about the dangers of prosecutors attempting to use, or

misuse, partial DNA profiles as an identification tool. *Wright*, 2012 IL App (1st) 073106, ¶ 83.